RECEIVED
Mail Room
MAR 24 2017
United States ...
District of ...

# United States Court of Appeals
for the District of columbia circuit

No. 17-5043

STANDING ROCK SIOUX TRIBE, EX REL
CHEYENNE RIVER SIOUX TRIBE, et al.,
Plaintiffs-Appellants,
v.

UNITED STATES ARMY CORPS OF ENGINEERS, et al.,
Defendants-Appellees.

4 up

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

## MOTION FOR THE PLAINTIFFS-APPELLANTS INTER ALIA FOR PERMISSION TO PARTICIPATE IN APPELLATE ARGUMENTS AND PRESENT TREATY CIVIL RIGHTS

This writer for the Appellants', Affiant in this appeal, respectfully seeks permission under Federal Rule of Appellate procedure 4(e) To participate in appellate argument and present treaty civil rights. In Support of this motion, The affiant presents the following information:

1. This court has held that the doctrine of trust responsibility also plays an important role in interpreting federal statutes and Treaties,

an unclear term in a treaty or statute must be interpreted in the manner most helpful to the tribe. Given the trust doctrine, courts must always assume that congress intends to assist rather than injure a tribe, and interpreting laws and treaties in favor of the tribe is consistent with That assumption. muscogee (creek) Nation v. Hodel, 851 F.2d 1439, 1445 (D.C. Cir. 1988), cert. denied, 488 U.S. 1010 (1989).

2. The Appellants filed a Appellate brief appealing the united states District court for the District of Columbia's Denial of their previous action, regarding the Dakota Access and Keystone pipelines in this case.

3. The District of Columbia, District Court in northwest sea farms, Inc. v. U.S. Army Corps of Engineers, 931 F. Supp. 1515 (W.D. wash. 1996). held that the Army corps of Engineers was sued when it refused to allow a non-Indian company to construct a fish farm in a manner That the Corps said would interfere with an Indian tribe's treaty right To fish at that location.

4. Appellees, et al., However, recognized that Indians and Tribes under The Trust doctrine can compel federal officials to perform the duties congress has delegated to them because congress has the authority to modify a trust relationship, but administrative agencies do not. 25 U.S.C. Sec. 461 (quoting Joint Tribal council of the Passamaquoddy v. morton, 528 F.2d 370 (1st cir. 1975)). Therefore, The writer clayton Creek, Affiant participation will not affect the overall appeal in this case.

5. This appeal concerns the application of The Appropriation Act of march 3, 1893, (27 Stat. 631), 25 U.S.C. 175. which requires united States district court attorneys to render legal services to Indians. Congress gave Indians the right to enjoy the best of both worlds when it comes to water rights. See 25 U.S.C. Sec. 324 (citing Arizona v. California, 373 U.S. 546, 600 (1963)). Accordingly, the Plaintiffs-Appellants have a strong interest in ensuring that Congress's requirements are properly interpreted and uniformly enforced.

For the foregoing reasons, the Affiant respectfully requests permission to participate in appellate arguments.

Dated this 20, day of march, 2017.

Clayton. Creek,
CLAYTON S. CREEK, AFFIANT,
For Plaintiffs-Appellants' (Tribes')

**U.S. Department of Justice**

Office of Tribal Justice

*Room 2318, RFK Main Justice Building*
*950 Pennsylvania Avenue, N.W.*
*Washington, D.C. 20530-0001*

*(202) 514-8812*
*FAX (202) 514-9078*

February 6, 2017

Clayton S. Creek, 198-MP-C54174
Department of Corrections
Mike Durfee State Prison
1412 Wood Street
Springfield SD 57062

Dear Mr. Creek:

Please note that your letter dated January 26, 2017, addressed to Ms. April Anderson, was forwarded to the Civil Rights Division at the U.S. Department of Justice for review and response. Thank you for contacting the Office of Tribal Justice.

Sincerely,

Jeanne Jacobs
Chief of Staff

NOTES:
Tribal Property Interests
Sioux Tribe v. United States
Supreme Court of the United States, 1942
316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501

1. Under the Property Clause, U.S. Const., Art. IV. § 3, CL. 2, Congress possesses authority over the public lands. But in Midwest Oil, cited in Sioux Tribe, the Court upheld President Taft's extensive withdrawals of oil and gas deposits under public lands on the grounds that Congress had "impliedly acquiesced" in unilateral Executive withdrawals of public lands, a prominent example being Indian reservations. If Congress "acquiesced" in the creation of Executive Order Indian reservations with all of the attributes of Treaty reservations, what principle removes compensability for takings from those attributes?

2. Beyond an explicit Act of Congress, what kind of federal actions are sufficient to "ratify" an Executive Order reservation and make its taking compensable? The Court in Sioux Tribe distinguished Shoshone Tribe v. United States, 299 U.S. 476 (1937), in which the Court held that tribal title had been confirmed by establishing federal schools on the reservation, granting allotments, and paying the tribe for earlier cessions of land. But, see Ute Indians v. United States, 330 U.S. 169 (1947). The President issued an Executive Order restoring lands to the tribe that had been excluded from the Treaty reservation by an erroneous survey. Several years later, the Indians were involved in hostilities with government employees, known as the "Meeker massacre". To punish the Indians, the government procured an agreement from the Ute leaders to cede "all the territory of the present Reservation" and to remove to lands in Utah and Southern Colorado. The agreement was ratified in an 1880 Act of Congress. By a later Act, the Utes were compensated for all but the Executive Order lands. The tribe brought a claim against the United States attempting to distinguish this from Sioux Tribe arguing that the 1880 Act confirmed the Indians' understanding that the White River Valley was always a part of their reservation. The Supreme Court rejected the argument and denied compensation.

3. It was not until 1919 that Congress insisted that only it, and not the Executive acting alone, had authority to create Indian reservations. A similar law affecting only Arizona and New Mexico had passed in 1918. 25 U.S.C.A.§ 211. Subsequent to this statute, changes to reservations were made by temporary secretarial withdrawals and affirmed by Congress. E.g., Arizona v. California, 373 U.S. 546, 596 (1963).

4. Then in 1927, as part of the oil and gas leasing Act, Congress prohibited changes in the boundaries of reservations created by Executive Order except by an Act of Congress. 25 U.S.C.A. § 398d. One article reviews the enactment and argues that it changed the status of Executive Order reservations.

In light of this legislative history, it is apparent that Congress intended the oil and gas leasing Act of 1927 to constitute "recognition" of Indian property interests in reservations established by Executive Order; therefore, any subsequent taking of such land or rights therein should be accompanied by compensation.

Interpreting the 1927 statute as an Act of recognition is consistent with the fact that Congress has not in practice discriminated between the property interests of tribes residing on Treaty and Executive Order reservations. Since 1883, for example, it has given the Indian tribes proceeds from the sale of metallic minerals and timber under statutes applicable to "lands of <u>any</u> Indians reservations". And although the Executive has in the past returned Executive Order reservations to the public domain without compensation, whenever Congress has reduced or revoked an Executive Order reservation, it has compensated the affected tribes in the same manner as it compensated for the taking of Treaty lands. Furthermore, Congress has treated all reservations alike for purposes of annual appropriations, expenditures of the Bureau of Indians Affairs, permanent capital improvements on reservations, and termination of federal control over specific tribes.

NOTE: <u>Tribal Property Interests in Executive Order Reservations: A Compensable Indian Right,</u> 69 Yale L.J. 627 (1960). This argument, however, was rejected in Sekaquaptewa v. MacDonald, 448 F.Supp. 1183, 1192 (D.Ariz.1978), affirmed in part and reversed in part on other grounds, 619 F.2d 801 (9th Cir.1980).

5. In 1946, Congress provided that takings of Executive Order lands before the effective date of the Act would be compensable in the Indian Claims Commission, 25 U.S.C.A. § 70a, discussed at pages 311-318, infra. See Fort Berthold Reservation v. United States, 390 F.2d 686, 696-97 (Ct.Cl.1968). Takings of Executive Order lands after 1946 are apparently compensable in the Claims Court under 28 U.S.C.A. § 1505. Both kinds of claims, however, involve "nonrecognized" title under existing law and are subject to the "no-interest" rule, pages 313-314, infra, so that awards bear interest only from the date of the award rather than from the date of taking. See, e.g., Note, <u>Toward a New System for the Resolution of Indian Resource Claims,</u> 47 N.Y.U.L. Rev. 1107, 1137 (1972). As a policy matter, Congress has compensated tribes when Executive Order land has been taken in recent years. See Felix S. Cohen, Handbook of Federal Indian Law 496-497 n. 202 (1982 ed.).

6. Another major class of Indian property interests, of course, is original Indian title (or "aboriginal title"). Is Indian title protected by the Fifth Amendment when taken by the United States and less than just compensation is paid? The answer first appeared to be "yes". In United States v. Alcea Band of Tillamooks, 329 U.S. 40, 47 (1946), a plurality opinion written by Chief Justice Vinson concluded that "[t]he Indians have more than a merely moral claim for compensation". Nine years later, the Court re-examined the Alcea Band language.

« up

# 236 U.S. 459

## 35 S.Ct. 309

## 59 L.Ed. 673

## UNITED STATES v. MIDWEST OIL COMPANY et al.

## *No. 278.*

*Argued January 9 and 12, 1914.*

Ordered for reargument before full bench April 20, 1914.

Reargued May 7, 1914.

Decided February 23, 1915.

ON A CERTIFICATE from the United States Circuit Court of Appeals for the Eighth Circuit, presenting the following questions:

1. Prior to the act of June 25, 1910 (36 Stat. at L. 847, 848, chap. 421, Comp. Stat. 1913, §§ 4523, 4525), did the President (or the Secretary of the Interior) have the lawful power, 'in aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain,' to withdraw public lands containing petroleum, and chiefly valuable therefor, from all forms of location, selection, filing, entry, or disposal under the public mineral-land laws?

2. Did petroleum withdrawal No. 5, of date September 27, 1909, have the effect of preventing the lawful location or acquisition of lands (described in said withdrawal order No. 5), which contained petroleum or other mineral oils, and were chiefly valuable therefor, by persons authorized to enter lands under the mining laws of the United States, under the provisions of the act of Congress entitled, 'An Act to Authorize the Entry and Patenting of Lands Containing Petroleum and Other Mineral Oils under the Placer-Mining Laws of the United States,' approved February 11, 1897 (29 Stat. at L. 526, chap. 216, Comp. Stat. 1913, § 4635).

3. Must the efficacy of the order of September 27, 1909, to reserve the land in controversy from the subsequent initiation and acquisition of rights under the act of February 11, 1897, supra, be held to depend upon the nature of the purpose or purposes for which it was made?

4. If question No. 3 be answered in the affirmative, then was it essential to the validity of the reservation or withdrawal that the purpose or purposes be expressed in the order itself?

5. If there were specific purposes actuating the order of September 27, 1909, sufficient in law to sustain it, and consistent with, but not appearing in, its language, was it incumbent on the plaintiff to allege such specific purposes in its bill in order to have the advantage of them as against the defendant's motion to dismiss?

3

« up

6. Assuming that the general purposes expressed in the order of September 27, 1909, do not suffice alone to determine its validity or invalidity, and that there might have been another consistent purpose sufficient to sustain it, should the order be presumed to be valid in the absence of any allegation or proof that such other purpose did not exist?

This suit originated in a bill in equity filed by the United States in the District Court of the United States for the District of Wyoming, seeking to recover certain tracts of petroleum lands and to obtain an accounting for petroleum alleged to have been illegally extracted therefrom. The court sustained the defendant's demurrer and dismissed the bill, whereupon the government took the case to the Circuit Court of Appeals, which rendered no decision, but certified the above questions to the Supreme Court. Case remanded to the District Court, with directions to reverse the decree dismissing the bill.

The facts are stated in the opinion.

Solicitor General Davis and Assistant Attorney General Knaebel for the United States.

Messrs. Joel F. Vaile, Henry McAllister, Jr., William N. Vaile, Karl C. Schuyler, Walter F. Schuyler, A. M. Stevenson, and Lee Champion for the Midwest Oil Company et al.

[Argument of Counsel from pages 460-465 intentionally omitted]

Messrs. Aldis B. Browne, Alexander Britton, Evans Browne, Francis W. Clements, Frederic R. Kellogg, E. S. Pillsbury, Oscar Sutro, and Frank H. Short as *amici curioe*.

Mr. Justice Lamar delivered the opinion of the court:

All public lands containing petroleum or other mineral oils, and chiefly valuable therefor, have been declared by Congress to be 'free and open to occupation, exploration, and purchase by citizens of the United States . . . under regulations prescribed by law.' Act of February 11, 1897, 29 Stat. at L. 526, chap. 216, Comp. Stat. 1913, § 4635; Rev. Stat. §§ 2319, 2329, Comp. Stat. 1913, §§ 4614, 4628.

As these regulations permitted exploration and location without the payment of any sum, and as title could be obtained for a merely nominal amount, many persons availed themselves of the provisions of the statute. Large areas in California were explored; and petroleum having been found, locations were made, not only by the discoverer, but by others on adjoining land. And, as the flow through the well on one lot might exhaust the oil under the adjacent land, the interest of each operator was to extract the oil as soon as possible, so as to share what would otherwise be taken by the owners of nearby wells.

The result was that oil was so rapidly extracted that on September 17, 1909, the Director of the Geological Survey made a report to the Secretary of the Interior which, with inclosures, called attention to the fact that, while there was a limited supply of coal on the Pacific coast, and the value of oil as a fuel had been fully demonstrated, yet, at the rate at which oil lands in California were being patented by private parties, it would 'be impossible for the people of the United States to continue ownership of oil lands for more than a few months. After that the government will be obliged to repurchase the very oil that it has practically given away. . . .' 'In view of the increasing use of fuel by the American Navy there would appear to be an immediate necessity for assuring the conservation of a proper supply of petroleum

10 for the government's own use. . . .' and 'pending the enactment of adequate legislation on this subject, the filing of claims to oil lands in the state of California should be suspended.'

« up

This recommendation was approved by the Secretary of the Interior. Shortly afterwards he brought the matter to the attention of the President, who, on September 27, 1909, issued the following proclamation:

Temporary Petroleum Withdrawal No. 5.

In aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain, all public lands in the accompanying lists are hereby temporarily withdrawn from all forms of location, settlement, selection, filing, entry, or disposal under the mineral or nonmineral public-land laws. All locations or claims existing and valid on this date may proceed to entry in the usual manner after filing, investigation, and examination.

The list attached described an area aggregating 3,041,000 acres in California and Wyoming—though, of course, the order only applied to the public lands therein, the acreage of which is not shown.

On March 27, 1910, six months after the publication of the proclamation, William T. Henshaw and others entered upon a quarter section of this public land in Wyoming, so withdrawn. They made explorations, bored a well, discovered oil, and thereafter assigned their interest to the appellees, who took possession and extracted large quantities of oil. On May 4, 1910, they filed a location certificate.

9 As the explorations by the original claimants, and the subsequent operation of the well, were both long after the date of the President's proclamation, the government filed, in the district court of the United States for the district of Wyoming, a bill in equity against the Midwest Oil Company and the other appellees, seeking to recover the land and to obtain an accounting for 50,000 barrels of oil alleged to have been illegally extracted. The court sustained the defendant's demurrer and dismissed the bill. Thereupon the government took the case to the circuit court of appeals of the eighth circuit, which rendered no decision, but certified certain questions to this court, where an order was subsequently passed, directing the entire record to be sent up for consideration.

The case has twice been fully argued. Both parties, as well as other persons interested in oil lands similarly affected, have submitted lengthy and elaborate briefs on the single and controlling question as to the validity of the withdrawal order. On the part of the government it is urged that the President, as Commander in Chief of the Army and Navy, had power to make the order for the purpose of retaining and preserving a source of supply of fuel for the Navy, instead of allowing the oil land to be taken up for a nominal sum, the government being then obliged to purchase at a great cost what it had previously owned. It is argued that the President, charged with the care of the public domain, could, by virtue of the executive power vested in him by the Constitution (art. 2, § 1), and also in conformity with the tacit consent of Congress, withdraw, in the public interest, any public land from entry or location by private parties.

The appellees, on the other hand, insist that there is no dispensing power in the Executive, and that he could not suspend a statute or withdraw from entry or location any land which Congress had affirmatively declared should be free and open to acquisition by citizens of the United States. They further insist that the withdrawal

16

« up order is absolutely void, since it appears on its face to be a mere attempt to suspend a statute—supposed to be unwise—in order to allow Congress to pass another more in accordance with what the Executive thought to be in the public interest.

1. We need not consider whether, as an original question, the President could have withdrawn from private acquisition what Congress had made free and open to occupation and purchase. The case can be determined on other grounds and in the light of the legal consequences flowing from a long-continued practice to make orders like the one here involved. For the President's proclamation of September 27, 1909, is by no means the first instance in which the Executive, by a special order, has withdrawn lands which Congress, by general statute, had thrown open to acquisition by citizens. And while it is not known when the first of these orders was made, it is certain that 'the practice dates from an early period in the history of the government.' Grisar v. McDowell, 6 Wall. 381, 18 L. ed. 868. Scores and hundreds of these orders have been made; and treating them as they must be (Wolsey v. Chapman, 101 U. S. 769, 25 L. ed. 920), as the act of the President, an examination of official publications will show that (excluding those made by virtue of special congressional action, Donnelly v. United States, 228 U. S. 255, 57 L. ed. 825, 33 Sup. Ct. Rep. 449, Ann. Cas. 1913E, 710), he has, during the past eighty years, without express statutory,—but under the claim of power so to do,—made a multitude of Executive orders which operated to withdraw public land that would otherwise have been open to private acquisition. They affected every kind of land mineral and nonmineral. The size of the tracts varied from a few square rods to many square miles, and the amount withdrawn has aggregated millions of acres. The number of such instances cannot, of course, be accurately given, but the extent of the practice can best be appreciated by a consideration of what is believed to be a correct enumeration of such Executive orders mentioned in public documents.[1]

13 They show that prior to the year 1910 there had been issued

99 Executive orders establishing or enlarging Indian reservations;

109 Executive orders establishing or enlarging military reservations and setting apart land for water, timber, fuel, hay, signal stations, target ranges, and rights of way for use in connection with military reservations;

44 Executive orders establishing bird reserves.

17 In the sense that these lands may have been intended for public use, they were reserved for a public purpose. But they were not reserved in pursuance of law, or by virtue of any general or special statutory authority. For it is to be specially noted that there was no act of Congress providing for bird reserves or for these Indian reservations. There was no law for the establishment of these military reservations or defining their size or location. There was no statute empowering the President to withdraw any of these lands from settlement, or to reserve them for any of the purposes indicated.

But when it appeared that the public interest would be served by withdrawing or reserving parts of the public domain, nothing was more natural than to retain what the government already owned. And in making such orders, which were thus useful to the public, no private interest was injured. For, prior to the initiation of some right given by law, the citizen had no enforceable interest in the public statute, and no private right in land which was the property of the people. The President was in a position to know when the public interest required particular portions of the people's

20 lands to be withdrawn from entry or location; his action inflicted no wrong upon
« up any private citizen, and being subject to disaffirmance by Congress, could occasion no harm to the interest of the public at large. Congress did not repudiate the power claimed or the withdrawal orders made. On the contrary, it uniformly and repeatedly acquiesced in the practice, and, as shown by these records, there had been, prior to 1910, at least 252 Executive orders making reservations for useful, though nonstatutory, purposes.

This right of the President to make resercations—and thus withdraw land from private acquisition—was expressly recognized in Grisar v. McDowell, 6 Wall. 364 (9), 381, 18 L. ed. 863, 868, where (1867) it was said that 'from an early period in the history of the government it has been the practice of the President to order from time to time, as the exigencies of the public service required, parcels of land belonging to the United States, to be reserved from sale and set apart for public uses.'

But, notwithstanding this decision and the continuity of this practice, the absence of express statutory authority was the occasion of doubt being expressed as to the power of the President to make these orders. The matter was therefore several times referred to the law officers of the government for an opinion on the subject. One of them stated (1889) (19 Ops. Atty. Gen. 370) that the validity of such orders rested on 'a long-established and long-recognized power in the President to withhold from sale or settlement at discretion, portions of the public domain.' Another reported that 'the power of the President was recognized by Congress, and that such recognition was equivalent to a grant' (17 Ops. Atty. Gen. 163) (1881). Again, when the claim was made that the power to withdraw did not extend to mineral land, the Attorney General gave the opinion that the power must be 'regarded as extending to any lands which belong to the public domain, and capable of being exercised with respect to such lands so long as they remain unappropriated.' (17 Ops. Atty. Gen. 232) (1881).

21 Similar views were expressed by officers in the Land Department. Indeed, one of the strongest assertions of the existence of the power is the frequently quoted statement of Secretary Teller, made in 1881:

22 'That the power resides in the Executive from an early period in the history of the country to make reservations has never been denied either legislatively or judicially, but, on the contrary, has been recognized. It constitutes in fact a part of the Land Office law, existe *ex necessitate rei*, as indispensable to the public weal, and in that light, by different laws enacted as herein indicated, has been referred to as an existing undisputed power too well settled ever to be disputed. 1 Land Dec. 702 (1881-3).'

2. It may be argued that while these facts and rulings prove a usage, they do not establish its validity. But government is a practical affair, intended for practical men. Both officers, lawmakers, and citizens naturally adjust themselves to any long-continued action of the Executive Department, on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle, but the basis of a wise and quieting rule that, in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself,—even when the validity of the practice is the subject of investigation.

This principle, recognized in every jurisdiction, was first applied by this court in the often-cited case of Stuart v. Laird, 1 Cranch, 299, 309, 2 L. ed. 115, 118. There, answering the objection that the act of 1789 [1 Stat. at L. 73, chap. 20] was unconstitutional in so far as it gave circuit powers to judges of the Supreme Court, it

25 was said (1803) that, 'practice and acquiescence under it for a period of several « up years, commencing with the organization of the judicial system, affords an irresistible answer, and has, indeed, fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled.'

Again, in McPherson v. Blacker, 146 U. S. 1(4), 36 L. ed. 869, 13 Sup. Ct. Rep. 3, where the question was as to the validity of a state law providing for the appointment of Presidential electors, it was held that, if the terms of the provision of the Constitution of the United States left the question of the power in doubt, the 'contemporaneous and continuous subsequent practical construction would be treated as decisive' (36). Fairbank v. United States, 181 U. S. 307, 45 L. ed. 872, 21 Sup. Ct. Rep. 648, 15 Am. Crim. Rep. 135; Cooley v. Port Wardens, 12 How. 315, 13 L. ed. 1003. See also Grisar v. McDowell, 6 Wall. 364, 381, 18 L. ed. 863, 868, where, in 1867, the practice of the Executive Department was referred to as evidence of the validity of these orders making reservations of public land, even when the practice was by no means so general and extensive as it has since become.

26 3. These decisions do not, of course, mean that private rights could be created by an officer withdrawing for a railroad more than had been authorized by Congress in the land grant act. Southern P. R. Co. v. Bell, 183 U. S. 685, 46 L. ed. 388, 22 Sup. Ct. Rep. 232; Brandon v. Ard, 211 U. S. 21, 53 L. ed. 72, 29 Sup. Ct. Rep. 1. Nor do these decisions mean that the Executive can, by his course of action, create a power. But they do clearly indicate that the long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the withdrawals had been made in pursuance of its consent or of a recognized administrative power of the Executive in the management of the public lands. This is particularly true in view of the fact that the land is property of the United States, and that the land laws are not of a legislative character in the highest sense of the term (art. 4, § 3), 'but savor somewhat of mere rules prescribed by an owner of property for its disposal.' Butte City Water Co. v. Baker, 196 U. S. 126, 49 L. ed. 412, 25 Sup. Ct. Rep. 211.

27 These rules or laws for the disposal of public land are necessarily general in their nature. Emergencies may occur, or conditions may so change as to require that the agent in charge should, in the public interest, withhold the land from sale; and while no such express authority has been granted, there is nothing in the nature of the power exercised which prevents Congress from granting it by implication just as could be done by any other owner of property under similar conditions. The power of the Executive, as agent in charge, to retain that property from sale, need not necessarily be expressed in writing. Lockhart v. Johnson, 181 U. S. 520, 45 L. ed. 982, 21 Sup. Ct. Rep. 665; Bronson v. Chappell, 12 Wall. 686, 20 L. ed. 438; Campbell v. Kenosha, 5 Wall. 194(2), 18 L. ed. 610.

28 For it must be borne in mind that Congress not only has a legislative power over the public domain, but it also exercises the powers of the proprietor therein. Congress 'may deal with such lands precisely as an ordinary individual may deal with farming property. It may sell or withhold them from sale.' Camfield v. United States, 167 U. S. 524, 42 L. ed. 262, 17 Sup. Ct. Rep. 864; Light v. United States, 220 U. S. 536, 55 L. ed. 574, 31 Sup. Ct. Rep. 485. Like any other owner it may provide when, how, and to whom its land can be sold. It can permit it to be withdrawn from sale. Like any other owner, it can waive its strict rights, as it did when the valuable privilege of grazing cattle on this public land was held to be based upon an 'implied license growing out of the custom of nearly a hundred years.' Buford v. Houtz, 133 U. S. 326, 33 L. ed. 620, 10 Sup. Ct. Rep. 305. So, too, in the early days, the 'government, by its silent acquiescence, assented to the general occupation of the

30

public lands for mining.' Atchison v. Peterson, 20 Wall. 512, 22 L. ed. 416. If « up private persons could acquire a privilege in public land by virtue of an implied congressional consent, then, for a much stronger reason, an implied grant of power to preserve the public interest would arise out of like congressional acquiescence.

The Executive, as agent, was in charge of the public domain; by a multitude of orders extending over a long period of time, and affecting vast bodies of land, in many states and territories, he withdrew large areas in the public interest. These orders were known to Congress, as principal, and in not a single instance was the act of the agent disapproved. Its acquiescence all the more readily operated as an implied grant of power in view of the fact that its exercise was not only useful to the public, but did not interfere with any vested right of the citizen.

4. The appellees, however, argue that the practice thus approved related to reservations,—to cases where the land had been reserved for military or other special public purposes,—and they contend that even if the President could reserve land for a public purpose or naval uses, it does not follow that he can withdraw land in aid of legislation.

31 When analyzed, this proposition, in effect, seeks to make a distinction between a reservation and a withdrawal,—between a reservation for a purpose not provided for by existing legislation, and a withdrawal made in aid of future legislation. It would mean that a permanent reservation for a purpose designated by the President, but not provided for by a statute, would be valid, while a merely temporary withdrawal to enable Congress to legislate in the public interest would be invalid. It is only necessary to point out that, as the greater includes the less, the power to make permanent reservations includes power to make temporary withdrawals. For there is no distinction in principle between the two. The character of the power exerted is the same in both cases. In both, the order is made to serve the public interest, and in both the effect on the intending settler or miner is the same.

32 But the question need not be left solely to inference, since the validity of withdrawal orders, in aid of legislation, has been expressly recognized in a series of cases involving a number of such orders, made between 1850 and 1862. Dubuque & P. R. Co. v. Litchfield, 23 How. 66, 16 L. ed. 500; Wolcott v. Des Moines Nav. & R. Co. 5 Wall. 681, 18 L. ed. 689; Wolsey v. Chapman, 101 U. S. 755, 25 L. ed. 915; Litchfield v. Webster County, 101 U. S. 773, 25 L. ed. 925; Bullard v. Des Moines & Ft. D. R. Co. 122 U. S. 167, 30 L. ed. 1123, 7 Sup. Ct. Rep. 1149.

It appears from these decisions, and others cited therein, that in 1846 Congress made to the territory of Iowa, a grant of land on both sides of the Des Moines, for the purpose of improving the navigation from the mouth of the river to Raccoon Fork (5 Wall. 681). There was from the outset a difference of opinion as to whether the grant extended throughout the entire course of the river, or was limited to the land opposite that portion of the stream which was to be improved. In Dubuque & P. R. Co. v. Litchfield, 23 How. 66, 16 L. ed. 500, decided in 1860, it was held that the grant only included the land between the mouth of the river and Raccoon Fork. But for eleven years prior to that decision there had been various and conflicting rulings by the Land Department. It was first held that the grant included land *above* the Fork, and certificates were issued to the territory as the work progressed. That ruling was shortly followed by another, that the grant extended only *up to* the Fork.

'On April 6, 1850, Secretary Ewing, while concurring with Attorney General Crittenden in his opinion that the grant of 1846 did not extend beyond the Raccoon Fork, issued an order withholding all the lands then in controversy from market

39

« up

'until the close of the then session of Congress,' which order has been continued ever since' (we italicize) '*in order to give the state the opportunity of petitioning for an extension of the grant by Congress*.' Bullard v. Des Moines & Ft. D. R. Co. 122 U. S. 170, 30 L. ed. 1124, 7 Sup. Ct. Rep. 1149.

The withdrawal was made in 1851. The hoped-for legislation was not passed until several years later. Between those dates various private citizens made settlements by which, under various statutes, they initiated rights and acquired an interest in the land—if the withdrawal order was void. But by such settlements they obtained no rights if the withdrawal order was valid. A subsequent ratification could have related back to 1851, but if the withdrawal was originally void, the ratification, of course, could not cut out intervening rights of settlers. Cook v. Tullis, 18 Wall. 338 21 L. ed. 936.

There was litigation between settlers claiming, as here, under existing land laws, and those whose title depended upon the original validity of the *withdrawals made in aid of legislation*. (Riley v. Welles, 154 U. S. 578, 19 L. ed. 648, 14 Sup. Ct. Rep. 1166; Bullard v. Des Moines & Ft. D. R. Co. 122 U. S. 173, 30 L. ed. 1125, 7 Sup. Ct. Rep. 1149; Wolcott v. Des Moines Nav. & R. Co. 5 Wall. 681, 18 L. ed. 689.) In those suits, the withdrawal orders were not treated as having derived their validity from the legislation subsequently passed in aid of Iowa and its assignees, but they were treated as having been effective from their dates, regardless of the fact that the land included therein had not originally been granted to Iowa. In one of them it was said that:

'*This court has decided in a number of cases, in regard to thses lands, that this withdrawal operated to exclude from sale, purchase, or pre-emption all the lands in controversy*.' Bullard v. Des Moines & Ft. D. R. Co. 122 U. S. 170, 30 L. ed. 1124, 7 Sup. Ct. Rep. 1149.

5. Beginning in 1850 with this order of Secretary Ewing, in aid of legislation on behalf of Iowa, and its continuance even after this court had decided that no land above the Fork passed to the territory (23 How. 66), the practice of making withdrawals continued down to 1910. The reasons for making the withdrawal orders varied, but the power exerted was the same, and was supported by the same implied consent of Congress.

For, if any distinction can be drawn between the principle decided in the Iowa cases and this; or if the power involved in making a reservation could differ from that exercised in making a withdrawal,—then the Executive practice and congressional acquiescence, which operated as a grant of an implied power to make permanent reservations, are also present to operate as a grant of an implied power to make temporary withdrawals. It may be well to refer to some of the public records showing the existence and extent of the practice.

40 Withdrawals in aid of legislation were made in particular cases (26 Land Dec. 347; 28 Land Dec. 361; 35 Land Dec. 11), and many others more general in their nature and much more extensive in their operation.

For example: The Land Department passed an order suspending the location and settlement of certain islands and all isolated tracts containing less than 40 acres 'with a view to submitting to Congress' the question as to whether legislation on the subject was not needed. 34 Land Dec. 245.

Reports to the 56th and 57th Congresses (26 Sen. Doc. 87; 22 House Doc. 108,

49

« up 445) contained a list of 'temporary withdrawals' made to prevent the disposal of land pending the consideration of the question of the advisability of setting the same apart as forest reservations.

Phosphate land was 'temporarily withdrawn, pending action by Congress.' House Doc. 43, 10, 61st Cong. 2d Sess.

44 There were also temporary withdrawals of oil land from agricultural entry, in aid of subsequent legislation. 26 Sen. Doc. 75; 43 House Doc. 8, 9, 10, 13 (61st Cong.).

In pursuance of a like practice and power, public land containing coal was withdrawn 'pending the enactment of new legislation.' 35 Land Dec. 395; 43 H. Doc. 8, 13. In the message of the President to the 2d session of the 59th Congress attention was called to the withdrawal of coal lands in aid of legislation. There was no repudiation of the order or of the practice either at that session, or at any succeeding session of Congress. It was claimed in the argument that the act of 1908 (35 Stat. at L. 424, chap. 211, Comp. Stat. 1913, § 5075) was the legislation contemplated by the Executive when coal lands were temporarily withdrawn by the order of 1906; and reference has already been made to the act of 1861 [12 Stat. at L. 251] concerning the Iowa lands withdrawn in 1849. There were other instances in which there was congressional action at a more or less remote period after the order of temporary withdrawal. The land for the Wind Cave Park was withdrawn in 1900 and the Park was established in 1903 (32 Stat. at L. 765, chap. 63, Comp. Stat. 1913, § 5231); bird reserves were established in 1903, and, in 1906 (34 Stat. at L. 536, chap. 3565, Comp. Stat. 1913, § 10,252), an act was passed making it an offense to interfere with birds on reserves established by law, proclamation, or *Executive order*. See also 35 Land Dec. 11; 34 Stat. at L. 517, chap. 3555. But in the majority of cases there was no subsequent legislation in reference to such lands, although the withdrawal orders prevented the acquisition of any private interest in such land until after the order was revoked.

Whether, in a particular case, Congress acted or not, nothing was done by it which could, in any way, be construed as a denial of the right of the Executive to make temporary withdrawals of public land in the public interest. Considering the size of the tracts affected and the length of time they remained in force, without objection, these orders by which *islands, isolated tracts, coal, phosphate, and oil lands were withdrawn in aid of legislation*, furnish, in and of themselves, ample proof of congressional recognition of the power to withdraw.

But that the existence of this power was recognized and its exercise by the Executive assented to by Congress is emphasized by the fact that the above-mentioned withdrawals were issued after the report which the Secretary of the Interior made in 1902, in response to a resolution of the Senate calling for information 'as to what, if any, of the public lands, have been withdrawn from disposition under the settlement or other laws by order the Commissioner of the General Land Office, and *what, if any, authority of law exists for such order of withdrawal.*'

48 The answer to this specific inquiry was returned March 3, 1902 (Senate Doc. 232, 57th Cong. 1st Sess. vol. 17). On that date the Secretary transmitted to the Senate the elaborate and detailed report of the Commissioner of the Land Office, who, in response to the inquiry as to the authority by which withdrawals had been made, answered that:

'The power of the Executive Department of the government to make reservations

51 « up of land for public use, and to temporarily withdraw lands from appropriation by individuals as exigencies might demand, to prevent fraud, to aid in proper administration, and in aid of pending legislation, is one that has been long recognized both in the acts of Congress and the decisions of the court; . . . that this power has been long exercised by the Commissioner of the General Land Office is shown by reference to the date of some of the withdrawals enumerated. . . . The attached list embraces only such lands as were withdrawn by this office, acting on its own motion, in cases where the emergencies appeared to demand such action in furtherance of public interest, and does not include lands withdrawn under express statutes so directed.'

The list, which is attached, refers to withdrawal orders, about 100 in number, issued between 1870 and 1902. Many of them were in aid of the administration of the land laws: to correct boundaries; to prevent fraud; to make a classification of the land; and like good—but nonstatutory—reasons. Some were made to prevent settlements while the question was being considered as to whether the lands might not be included in a forest reservation to be thereafter established. One in 1889 (referred to also in 28 Land Dec. 358) was made in order to afford the state of Nebraska an opportunity to procure legislative relief, as in the *Iowa* cases above cited.

This report refers to *withdrawals*, and not to *reservations*. It is most important in connection with the present inquiry as to whether Congress knew of the practice to make temporary withdrawals and knowingly assented thereto. It will be noted that the resolution called on the Department to state the extent of such withdrawals and the authority by which they were made. The officer of the Land Department, in his answer, shows that there have been a large number of withdrawals made for good, but for nonstatutory, reasons. He shows that these 92 orders had been made by virtue of a long-continued practice and under claim of a right to take such action in the public interest 'as exigencies might demand . . .' Congress, with notice of this practice and of this claim of authority, received the report. Neither at that session nor afterwards did it ever repudiate the action taken or the power claimed. Its silence was acquiescence. Its acquiescence was equivalent to consent to continue the practice until the power was revoked by some subsequent action by Congress.

52 6. Nor is the position of the appellees strengthened by the act of June 25, 1910, (36 Stat. at L. 847, chap. 421, Comp. Stat. 1913, § 4523), to authorize the President to make withdrawals of public lands, and requiring a list of the same to be filed with Congress.

53 It was passed after the President's Proclamation of September 27, 1909, and months after the occupation and attempted location by virtue of which the appellees claim to have acquired a right to the land. This statute expressly provided that it should not 'be construed as a recognition, abridgment, or enlargement of any asserted rights or claims initiated upon any oil or gas bearing lands after any withdrawal of such lands, made prior to the passage of this act.'

True, as argued, the act provides that it shall not be construed as an '*abridgment* of asserted rights initiated in oil lands after they had been withdrawn.' But it likewise provides that it shall not be considered as a 'recognition of such rights.' There is, however, nothing said indicating the slightest intent to repudiate the withdrawals already made.

The legislative history of the statute shows that there was no such intent and no purpose to make the act retroactive, or to disaffirm what the agent in charge had

USCA Case #17-5043 Document #1667971 Filed: 03/24/2017 Page 17 of 43


57 already done. The proclamation of September 27, 1909, withdrawing oil lands « up from private acquisition, was of far-reaching consequence both to individuals and to the public. It gave rise to much discussion, and the old question as to the authority of the President to make these orders was again raised. Various bills were introduced on the subject, and the President himself sent a message to Congress, calling attention to the existence of the doubt, and suggesting the desirability of legislation to expressly grant the power and ratify what had been done. A bill passed the House, containing such ratification and authorizing future withdrawals. When the bill came to the Senate it was referred to a committee, and, as its members did not agree in their view of the law, two reports were made. The majority, after a review of the practice of the Department, the acquiescence of Congress in the practice, and the decisions of the courts, reported that the President already had a general power of withdrawal, and recommended the passage of the pending bill, inasmuch as it operated to restrict the greater power already possessed. Sen. Rep. 171 (61st Cong. 2d Session). But having regard to the fact that private persons, on withdrawn land, had raised a question as to the validity of the order, and that such question presented a matter for judicial determination, Congress was studious to avoid doing anything which would affect either the public or private rights. It therefore used language which showed not only that the statute was not intended to be retrospective, but was not to be construed either as a recognition, enlargement, or repudiation of rights like those asserted by appellees.

In other words, if, notwithstanding the withdrawal, any locator had initiated a right which, however, had not been perfected, Congress did not undertake to take away his rights. On the other hand, if the withdrawal order had been legally made under the existing power, it needed no ratification, and if a location made after the withdrawal gave the appellees no right, Congress, by this statute, did not legislate against the public and validate what was then an invalid location. The act left the rights of parties in the position of these appellees, to be determined by the state of the law when the proclamation was issued. As heretofore pointed out, the lone-continued practice, the acquiescence of Congress, as well as the decisions of the courts, all show that the President had the power to make the order. And as was said in Wolsey v. Chapman, 101 U. S. 769, 25 L. ed. 920, the '*withdrawal would be sufficient to defeat a settlement . . . while the order was in force.*'

The case is therefore remanded to the District Court with directions that the decree dismissing the bill be reversed.

58 Mr. Justice McReynolds took no part in the decision of this case.

59 Mr. Justice Day, with whom concurred Mr. Justice McKenna and Mr. Justice Van Devanter, dissenting:

60 This case originated in a bill filed by the United States in the United States district court for the district of Wyoming to restrain trespasses on a certain tract of public petroleum lands in the state of Wyoming, and to obtain an accounting for petroleum claimed to have been wrongfully extracted therefrom. The bill sets up ownership in the United States of the land in question, being a tract of 160 acres, and alleges that the land is chiefly valuable for petroleum; that on September 27, 1909, the tract in controversy, in common with many others, was withdrawn from mineral exploration and from all forms of location, settlement, selection, filing, entry, or disposal under the mineral or nonmineral public land laws of the United States; and that this was done by an order promulgated on that day by the Secretary of the Interior, pursuant to the direction of the President. The order listed townships and sections aggregating more than 3,000,000 acres, situated in the states of Wyoming and California. The

62

« up

terms of this order, styled 'Temporary petroleum withdrawal No. 5,' are:

'In aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain, all public lands in the accompanying lists are hereby temporarily withdrawn from all forms of location, settlement, selection, filing, entry, or disposal under the mineral or nonmineral public land laws. All locations or claims existing and valid on this date may proceed to entry in the usual manner after field investigation and examination.'

It appears from the averments of the bill that the lands were originally located by certain individuals after the order of withdrawal and on March 27, 1910; that they were entered upon, explored, and a well drilled, thereby rendering subject to ready extraction large deposits of petroleum of great value; and that the original claimants caused to be filed and recorded in the records of Natrona county, Wyoming, a certain location certificate evidencing claim and location by them of the land as a petroleum placer-mining claim under and in pursuance of the mining laws of the United States. These parties subsequently assigned their rights to the defendant, the Midwest Oil Company, and certain other persons named. The bill also avers that after the withdrawal order of September 27, 1909, on July 2, 1910, a further order of withdrawal, described as 'Order of withdrawal. Petroleum reserve No. 8,' was made by the President, expressly affirming the order of September 27, 1909.

63 The law under which the location in question was made (29 Stat. at L. 526, chap. 216, Comp. Stat. 1913, § 4635) reads:

64 'That any person authorized to enter lands under the mining laws of the United States may enter and obtain patent to lands containing petroleum of other mineral oils, and chiefly valuable therefor, under the provisions of the laws relating to placer mineral claims.'

Under Rev. Stat. § 2329, Comp. Stat. 1913, § 4628, provision was made for entering and patenting placer-mining claims in like manner as vein or lode claims; and by Rev. Stat. § 2319, Comp. Stat. 1913, § 4614, 'all valuable mineral deposits' were opened to exploration and purchase, and the lands containing them to occupation and purchase under regulations prescribed by law, and according to the local customs or rules of miners.

While the allegations of the bill do not set out all the steps which led up to the President's order of withdrawal of September 27, 1909, we may not only look to its allegations, but read them in the light of public documents embodying the history of the transaction, of which we may take judicial notice. On September 27, 1909, the Secretary of the Interior, by direction of the President, issued the temporary petroleum withdrawal order No. 5, above set forth. The making of this order was preceded by certain correspondence leading up to it. On February 24, 1908, the Director of the Geological Survey addressed a letter to the Scretary of the Inerior, setting forth his opinion as to the superiority of liquid fuel for the Navy, the inadequacy of the coal supply on the Pacific coast, and the fact that the demand for oil was greater than the supply, and that but little oil land remained under governmental control, and that this was being rapidly patented, and his recommendation that the filing of claims to oil lands in California be suspended in order that the government might continue the ownership of the valuable supplies of liquid fuel. On the 17th of September, 1909, the Director sent another letter to the Secretary of the Interior, inclosing a copy of his earlier letter, and saying, in substance, that the arguments contained in that letter had been reinforced by the Survey's Conservation Report on the petroleum resources of the United States, which

69

« up

showed that at that time the production exceeded the demand of the trade, and inasmuch as the disposal of the public petroleum lands at nominal prices encouraged overproduction, legislation providing for the sane development of such resources should be enacted. He also stated that the conservation of the petroleum supply demanded a law providing for the disposal of the oil remaining in the public lands in terms of barrels of oil rather than in acres of land; and further that, considering the use of lubricating oil and of fuel oil for the Navy, there was an immediate necessity for conserving a proper supply of petroleum for the government's use, and he recommended the suspension of the filing of claims to oil lands in California pending legislation on the subject. He also called attention to the fact that the Commissioner of the General Land Office, acting upon his report classifying certain oil lands in California, had issued instructions withholding such oil lands from agricultural entry pending consideration of legislation. And on the same day the Secretary of the Interior addressed a letter to the President, calling his attention to the subject of conservation of the petroleum resources of the public domain, especially with reference to the requirements of the Navy, repeating the substance of the Director's letter, and stating that other lands than those mentioned in the Director's letter had also been withdrawn from entry in California, and concluding that legislation was needed which would assure conservation of an adequate supply of petroleum for the government's needs, but which, he believed, would not interfere with the private development of the California oil pools, and therefore the necessity for temporary withdrawals of the land from entry. Shortly thereafter, on September 26, 1909, the Secretary of the Interior telegraphed to the Acting Secretary from Salt Lake City, where he had seen the President, as follows:

'Have conferred with President respecting temporary withdrawals covering oil lands. If present withdrawals permit mining entries being made of such lands wish the withdrawals modified at once to prohibit such disposition pending legislation.'

68 The following day the Acting Secretary telegraphed to the Secretary at Helena, Montana:

'Telegram 26th received. California and Wyoming petroleum withdrawals heretofore made permit mining locations. Following your direction I have temporarily withdrawn from all forms of location and entry 2,871,000 acres in California and 170,000 acres in Wyoming, all heretofore withdrawn for classification. My withdrawal prevents all forms of acquisition in future and holds the land *in statu quo* pending legislation.'

And thereupon the withdrawal order of September 27, 1909, above set forth, was promulgated.

It is to be observed that the lands here in controversy are situated in the state of Wyoming. There was no suggestion that such lands would ever be needed as a basis of oil supply for the Navy. They were withdrawn solely upon the suggestion that a better disposition of them could be made than was found in the existing acts of Congress controlling the subject.

72 From this statement it is evident that the first question to be decided concerns the validity of the President's withdrawal order of September 27, 1909, and it is necessary to determine whether that order was within the authority of the President, and had the effect to withdraw the land in controversy from location under the mineral land law, or whether, as held in the court below, that order had no force and effect to prevent persons from acquiring rights under the then-existing statutes of the United States concerning the subject.

73

73 The Constitution of the United States in article 4, § 3, provides: 'The Congress « up shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States.' In this section the power to dispose of lands belonging to the United States is broadly conferred upon Congress, and it is under the power therein given that the system of land laws for the disposition of the public domain has been enacted. United States v. Gratiot, 14 Pet. 526, 536, 537, 10 L. ed. 573, 578; United States v. Fitzgerald, 15 Pet. 407, 421, 10 L. ed. 785, 790; Van Brocklin v. Tennessee, (Van Brocklin v. Anderson) 117 U. S. 151, 168, 29 L. ed. 845, 851, 6 Sup. Ct. Rep. 670; Wisconsin C. R. Co. v. Price County, 133 U. S. 496, 504, 33 L. ed. 687, 690, 10 Sup. Ct. Rep. 341. In the last case this court said:

74 'The Constitution vests in Congress the power to 'dispose of the make all needful rules and regulations respecting the territory or other property belonging to the United States.' And this implies an exclusion of all other authority over the property which could interfere with this right or obstruct its exercise.'

It is contended on behalf of the government that the power of the President to make such orders as are here in question has grown up from the authorization of Congress in its legislation and because of its long sanction by acquiescence in the exercise of such Executive authority, so that, if it be admitted that the authority of the President to deal with the public lands must come from Congress, the sanction which such action of the Executive has received in the course of many years of legislation and congressional acquiescence is as effective as though the express authority had been conferred by law. In aid of this argument the general course of legislation is pointed to, and the decisions of this court and opinions of Attorneys General in connection with certain acts are cited. Upon the other hand, it is contended that if these acts are to be taken as the general declaration of congressional intent upon the subject, they contain express authorization of the President to make withdrawals when Congress wishes to confer such power. Some of the instances referred to are set out in the margin.[2]

76 It is thus explicitly recognized, as was already apparent from the terms of the Constitution itself, that the sole authority to dispose of the public lands was vested in the Congress, and in no other branch of the Federal government. The right of the Executive to withdraw lands which Congress has declared shall be open and free to settlement upon terms which Congress has itself prescribed is said to arise from the tacit consent of Congress in long acquiescence in such Executive action, resulting in an implied authority from Congress to make such withdrawals in the public interest as the Executive deems proper and necessary. There is nothing in the Constitution suggesting or authorizing such augmentation of Executive authority, or justifying him in thus acting in aid of a power which the framers of the Constitution saw fit to vest exclusively in the legislative branch of the government.

It is true that many withdrawals have been made by the President and some of them have been sustained by this court, so that it may be fairly said that, within limitations to be hereinafter stated, Executive withdrawals have the sanction of judicial approval; but, as we read the cases, in no instance has this court sustained a withdrawal of public lands for which Congress has provided a system of disposition, except such withdrawal was—(a) in pursuance of a policy already declared by Congress as one for which the public lands might be used, as military and Indian reservations, for which purposes Congress has authorized the use of the public lands from an early day, or (b) in cases where grants of Congress are in such conflict that the purpose of Congress cannot be known, and therefore the Secretary of the Interior has been sustained in withdrawing the lands from entry until Congress had

78
« up opportunity to relieve the ambiguity of its laws by specifically declaring its policy.

It is undoubtedly true that withdrawals have been made without specific authority of an act of Congress, but those which have been sustained by this court, it is believed, will be found to be in one or the other of the categories above stated. On the other hand, when the Executive authority has been exceeded, this court has not hesitated to so declare, and to sustain the superior and exclusive authority of Congress to deal with the public lands.

79 The first decision of this court which has come to our attention in which this matter was dealt with is Wilcox v. Jackson, 13 Pet. 498, 10 L. ed. 264, decided in 1839. That case involved a controversy concerning the lands occupied by the military post called Fort Dearborn, in Cook county, Illinois. The lands had been used for many years as a military post and an Indian agency, and in 1824 were reserved by the Commissioner of the General Land Office at the request of the Secretary of War for military purposes. It also appears that prior to May 1, 1834, the government built a lighthouse on part of the land. When the suit was brought by Jackson to recover them they were in the possession of Wilcox, commander of the post, who claimed the right to hold them as an officer of the United States under the orders of the Secretary of War. The claim asserted by Jackson arose from the preemption allowed to his lessor's predecessor in title under the act of June 19, 1834 (4 Stat. at L. 678, chap. 54), which revived the act of May 29, 1830 (4 Stat. at L. 420, chap. 208), which provided that 'no entry or sale of any land shall be made, under the provisions of this act, which shall have been reserved for the use of the United States, or either of the several states, . . . [or] which is reserved from sale by act of Congress, or by order of the President, or which may have been appropriated for any purpose whatsoever.' The court, after stating that lands which had been appropriated for any purpose whatsoever were exempt from pre-emption and that the lands in question had been in fact appropriated, reviewed lagislation authorizing the President to erect fortifications and to establish trading houses, and, in concluding that the appropriation had been made by authority of law, said (p. 512):

80 'We thus see that the establishing [*of*] trading houses with the Indian tribes, and the erection of fortifications in the West, are purposes authorized by law; and that they were to be established and erected by the President. But the place in question is one at which a trading house has been established, and a fortification or military post erected. It would not be doubted, we suppose, by anyone, that if Congress had by law directed the trading house to be established and the military post erected at Fort Dearborn, by name, that this would have been by authority of law. But instead of designating* the place themselves, they left it to the discretion of the President, which is precisely the same thing in effect. Here, then, is an appropriation, not only for one, but for two purposes, of the same place by authority of law. But there has been a third appropriation in this case by authority of law. Congress, by law, authorized the erection of a lighthouse at the mouth of Chicago river, which is within the limits of the land in question, and appropriated $5,000 for its erection; and the case agreed states that the lighthouse was built on part of the land in dispute before the 1st of May, 1834. We think, then, that there has been an appropriation, not only in fact, but in law.'

81 The court, after remarking that Congress must have known of the authority which had been given to the President by former laws to establish trading houses and military posts, and that a military post had long been established at Fort Dearborn, said (p. 514): 'They seem, therefore, to have been studious to use language of so comprehensive a kind, in the exemption from the right of pre-emption, as to embrace every description of reservation and appropriation which had been

82 « up previously made for public purposes.'

With reference to the reservation of 1824, the court merely said: 'We consider this, too, as having been done by authority of law; for amongst other provisions in the act of 1830, all lands are exempted from pre-emption which are reserved from sale by order of the President.' (And the court held that the act of the Secretary of War was that of the Executive.) But the court later laid down the rule that when lands have been legally appropriated, they immediately become severed from the mass of public lands, and that no subsequent law or proclamation would embrace them, although no reservation had been made of them. From that case, therefore, the following propositions are deduced: That where there is a legal appropriation, reservation is unnecessary, but that the reservation in that case had been ratified by a subsequent act of Congress. And that the appropriation of the land in controversy in that case had been by authority of law, *i. e.*, power placed in the President by Congress by acts passed before and after the exertion of such power by the President.

83 Grisar v. McDowell, 6 Wall. 363, 18 L. ed. 863, is another case relied upon. There had been a controversy between the city of San Francisco and the United States with reference to the extent of the pueblo lands belonging to the former, which had been determined by an order of court confirming the title of the city subject to the exception of lands 'reserved or dedicated to public uses by the United States' and by the act of Congress of March 8, 1866 (14 Stat. at L. 4, chap. 13), relinquishing the claim of the United States subject to the reservation in the decree. Grisar, claiming title from the city, sought to recover possession of land which had been reserved by order of the President for public purposes, and which was held by the defendant, an officer in the Army of the United States, commanding the military department of California, who had entered upon the premises and held them under the order of the Secretary of War as part of the public property of the United States reserved for military purposes. In dealing with the right of the President to make the reservation the court first held that it made no difference whether or not the President possessed sufficient authority to make the reservation, because, being a part of the public domain, they were excluded from lands affirmed to the state under which the plaintiff claimed. In dealing with the power of the President the court said:

84 'But, further than this: from an early period in the history of the government it has been the practice of the President to order, from time to time, as the exigencies of the public service required, parcels of land belonging to the United States to be reserved from sale and set apart for public uses.'

85 In this connection the court cited acts of Congress recognizing the authority of the President, among others, the pre-emption act of May 29, 1830, supra, in which it was provided that the right of pre-emption should not extend to lands reserved from sale by act of Congress or by order of the President, and the act of September 4, 1841 (5 Stat. at L. 456, chap. 16), exempting lands reserved by any treaty, law, or proclamation of the President, and of March 3, 1853 (10 Stat. at L. 246, chap. 145), excepting lands appropriated under authority of the act, or reserved by competent authority, and held that this reservation by competent authority meant the authority of the President, and those acting under his direction. Furthermore, the court held that the action of the President in making the reservations had been indirectly approved by Congress by appropriating moneys for the construction of fortifications and other public works upon them, and that the reservations embraced lands upon which public buildings had been erected. The language of Mr. Justice Field, above quoted, as to the authority of the President, has been frequently quoted in subsequent opinions of Attorneys General, and has been made the basis of opinions for broad authority in the President. It is to be observed, however, that in that case

86

« up the law, recited in the opinion as giving the power of reservation, contained congressional authority directly to the President or competent authority, which it was held meant the President, and the statement was added that the action of the President had been approved by Congress appropriating money for fortifications and other public works.

The government also relied upon a series of cases in this court which may be called the Des Moines River Cases, beginning with Wolcott v. Des Moines Nav. & R. Co. 5 Wall. 681, 18 L. ed. 689, and followed by Riley v. Welles, 154 U. S. 578, and 19 L. ed. 648, 14 Sup. Ct. Rep. 1166; Williams v. Baker (Cedar Rapids & M. R. Co. v. Martindale) 17 Wall. 144, 21 L. ed. 561; Iowa Homestead Co. v. Valley R. Co. 17 Wall. 153, 21 L. ed. 622; Wolsey v. Chapman, 101 U. S. 755, 25 L. ed. 915; Litchfield v. Webster County, 101 U. S. 773, 25 L. ed. 925; Dubuque & S. C. R. Co. v. Des Moines Valley R. Co. 109 U. S. 329, 27 L. ed. 952, 3 Sup. Ct. Rep. 188; Bullard v. Des Moines & Ft. D. R. Co. 122 U. S. 167, 30 L. ed. 1123, 7 Sup. Ct. Rep. 1149; United States v. Des Moines Nav. & R. Co. 142 U. S. 510, 35 L. ed. 1099, 12 Sup. Ct. Rep. 308. In the original case, 5 Wall. 681, it is shown that the cases grew out of an act of Congress of August 8, 1846 (9 Stat. at L. 77, chap. 103), granting to the then territory of Iowa for the purpose of aiding it in improving the navigation of the Des Moines river from its mouth to the Raccoon Fork, 'one equal moiety, in alternate sections, of the public lands in a strip five miles in width on each side of said river.' This ambiguous description gave rise to the controversy which appeared from time to time in the cases mentioned, and arose from the doubt whether the grant to Iowa included lands above the Raccoon Fork. Early in the year 1848 the Commissioner of the General Land Office decided that the grant extended beyond Raccoon Fork, but later in that year the President by proclamation ordered the sale of some of this land above the Fork in the following October. On June 16, 1849, however, the Secretary of the Treasury, having construed the grant to include the lands above the Fork, directed that they should be reserved from the sale. The control of the General Land Office having passed to the Secretary of the Interior, on April 6, 1850, he reversed the decision of the Secretary of the Treasury, but directed that the lands embraced within the state's selections should be reserved from sale. The matter was before two Presidents and their cabinets, with different results, and finally, on Octor 29, 1851, the Secretary of the Interior held that, in view of the great conflict among executive officers of the government, and in view of the opinion of eminent jurists which had been presented to him in favor of the construction contended for by the state, he was willing to recognize the claim of the state and approve the selections, without prejudice to the rights, if any there be, of other parties. The history of subsequent legislation, not necessary to now recite, is given in the opinion, and then the act of May 15, 1856 (11 Stat. at L. 9, chap. 28), upon which the plaintiff relied, was considered, in which was found the provision that 'any and all lands heretofore reserved to the United States by any act of Congress, or in any other manner by competent authority for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever,' were reserved from the operation of the act. This was a grant made to the railroads which it was admitted covered the tract in controversy, unless excluded by the proviso. It was held that the lands had been reserved by competent authority, the court saying (p. 688):

'It has been argued that these lands had not been reserved by competent authority, and hence that the reservation was nugatory. As we have seen, they were reserved from sale for the special purpose of aiding in the improvement of the Des Moines river first, by the Secretary of the Treasury, when the Land Department was under his supervision and control, and again by the Secretary of the Interior after the establishment of this Department, to which the duties were assigned, and afterwards

89

« up continued by this Department under the instructions from the President and Cabinet. Besides, if this power was not competent, which we think it was ever since the establishment of the Land Department, and which has been exercised down to the present time, the grant of 8th August, 1846, carried along with it, by necessary implication, not only the power, but the duty, of the Land Office to reserve from sale the lands embraced in the grant. Otherwise its object might be utterly defeated. Hence, immediately upon a grant being made by Congress for any of these public purposes to a state, notice is given by the Commissioner of the Land Office to the registers and receivers to stop all sales, either public or by private entry. Such notice was given the same day the grant was made, in 1856, for the benefit of these railroads. That there was a dispute existing as to the extent of the grant of 1846 in no way affects the question. The serious conflict of opinion among the public authorities on the subject made it the duty of the land officers to withhold the sales and reserve them to the United States till it was ultimately disposed of.'

It is therefore apparent that this reservation was sanctioned, because it had become the duty of the officers, who were by law charged with the administration of the grants and required to give effect to them, to withhold the lands from sale and reserve them because of the doubt of the extent of the grant of 1846. In other words, if the lands had been granted to the state of Iowa, it could not possibly have been the intention of Congress to subject them to selection or grant under other laws, and this court said that the power to reserve them arose by necessary implication from the grant of 1846.

In Riley v. Welles, 154 U. S. 578, and 19 L. ed. 648, 14 Sup. Ct. Rep. 1166, involving a claim of title under the pre-emption section of the act of September 4, 1841, to land covered by the withdrawal under the act of 1846, this court followed Wolcott v. Des Moines Nav. & R. Co. 5 Wall. 681, 18 L. ed. 689, and repeated its decision as to the effect of the reservation.

90 In Williams v. Baker (Cedar Rapids & M. R. Co. v. Martindale) 17 Wall. 144, 21 L. ed. 561, and Iowa Homestead Co. v. Valley R. Co. 17 Wall. 153, 21 L. ed. 622, both involving title to lands claimed under the grant of 1856, as against titles founded on the 1846 act, as did the Wolcott Case, the court affirmed the validity of the reservation under the act of 1846, for the reason that the proviso in the act of 1856 prevented the railroad from acquiring the land.

91 In Wolsey v. Chapman, 101 U. S. 755, 25 L. ed. 915, where the controversy was whether the grant to the territory of Iowa, by the act of September 4, 1841, supra, of the right to select a quantity of lands for internal improvement purposes, excepting such as were or might be 'reserved from sale by any law of Congress or proclamation of the President,' permitted the selection of certain lands covered by the reservation in these cases, it was held (pp. 768, 769):

'They were reserved also in consequence of the act of 1846. The proper executive department of the government had determined that, because of doubts about the extent and operation of that act, nothing should be done to impair the rights of the state above the Raccoon Fork until the differences were settled, either by Congress or judicial decision. For that purpose an authoritative order was issued, directing the local land officers to withhold all the disputed lands from sale. This withdrew the lands from private entry, and, as we held in Riley v. Welles, was sufficient to defeat a settlement for the purpose of pre-emption while the order was in force, notwithstanding it was afterwards found that the law, by reason of which this action was taken, did not contemplate such a withdrawal.

100

*****

« up

'The truth is, there can be no reservation of public lands from sale except by reason of some treaty, law, or authorized act of the Executive Department of the government.'

Litchfield v. Webster County, 101 U. S. 773, 25 L. ed. 925, involved the question as to whether the title to the lands above the Fork vested in the state by the act of 1846, for purpose of taxation, and, affirming the previous cases, the court held that the action of the Executive Department of the general government reserved the land above the Fork so that it 'did not pass to the state when selected as school lands under the act of 1841, or as railroad lands by the grant of 1856, and were not open to pre-emption entry,' and the Executive order 'simply retained the ownership in the United States.'

96 The case of Dubuque & S. C. R. Co. v. Des Moines Valley R. Co. 109 U. S. 329, 27 L. ed. 952, 3 Sup. Ct. Rep. 188, also involved a controversy as to whether title vested under the river or railroad grant, and the court held that the validity of the reservation was no longer an open question.

The history of the matter was restated in Bullard v. Des Moines & Ft. D. R. Co. 122 U. S. 167, 30 L. ed. 1123, 7 Sup. Ct. Rep. 1149, it being made to appear especially that the order withdrawing the land was in effect during all the time up to the passage of the act of July 12, 1862 (12 Stat. at L. 543, chap. 161), and that after the decision in the case of Dubuque & P. R. Co. v. Litchfield, 23 How. 66, 16 L. ed. 500, had determined that Congress had not, by the act of 1846, granted the land above the Fork to Iowa, the Commissioner of the General Land Office, by notice of May 18, 1860, continued the reservation, notwithstanding the decision just referred to. And it was held that the resolution of Congress of March 2, 1861 (12 Stat. at L. 251), did not end the reservation, and that claims inaugurated after that resolution and before the passage of the act of July 12, 1862, were subject to the reservation. The court said (p. 170):

'This court has decided in a number of cases, in regard to these lands, that this withdrawal operated to exclude from sale, purchase, or pre-emption all the lands in controversy, and unless the case we are about to consider constitutes an exception, it has never been revoked.

*****

'During all this controversy there remained the order of the Department having control of the matter, withdrawing all the lands in dispute from public sale, settlement, or pre-emption. This withdrawal was held to be effectual against the grant made by Congress to the railroad companies in 1856, because that act contained the following proviso:

101 "That any and all lands heretofore reserved to the United States, by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be, and the same are hereby, reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the routes of said railroads through such reserved lands, in which case the right of way only shall be granted, subject to the approval of the President of the United States."

102 The court quoted the notice of the Commissioner of the General Land Office of May 18, 1860, that the land above the Fork 'which has been reserved from sale

104 heretofore on account of the claim of the state thereto will continue reserved, for « up the time being, from sale or from location, by any species of script or warrants, notwithstanding the recent decision of the Supreme Court against the claim. This action is deemed necessary to afford time for Congress to consider upon memorial or otherwise, the case of actual bona fide settlers holding under titles from the state, and to make such provision, by confirmation or adjustment of the claims of such settlers, as may appear to be right and proper.' And the court said (p. 173):

'It will thus be seen that, notwithstanding the decision of the Supreme Court of the United States in the winter of 1860, the Land Office determined that the reservation of these lands should continue for the purpose of securing the very action by Congress which the state of Iowa was soliciting, and it is not disputed by counsel for the appellant in this case that this was a valid continuation of such reservation, and that during its continuance the pre-emptions under which the plaintiff claims could not have been made. . . .

'We do not think the joint resolution had the effect to end the reservation of these lands from public entry. . . .

105 'This is not the way in which a reservation from sale or pre-emption of public lands is removed. In almost every instance in which such a reservation is terminated, there has been a proclamation by the President that the lands are open for entry or sale, and in most instances they have first been offered for sale at public auction. It cannot be seen, from anything in the joint resolution, that Congress either considered the controversy ended, or intended to remove the reservation instituted by the Department. Its immediate procedure at the next session to the full consideration of the whole subject shows that it had not ceased to deal with it; that the reason for this withdrawal or reservation continued as strongly as before, and it cannot be doubted that the subject was before Congress, as well as before its committees, and that the act of July 12, 1862, was, for the first time, a conclusion and end of the matter so far as Congress was concerned.'

106 The last of the Des Moines River Cases, United States v. Des Moines Nav. & R. Co. 142 U. S. 510, 35 L. ed. 1099, 12 Sup. Ct. Rep. 308, was a suit instituted by the United States to quiet its title to certain of the lands conveyed by the state of Iowa to the Navigation Company and others, claiming that the trust had not been performed, and, after reviewing the history of the matter and the previous cases at considerable length, the court again stated the effect of the reservation (p. 528):

'The validity of this reservation was sustained in the case of Wolcott v. Des Moines Nav. & R. Co. 5 Wall. 681, 18 L. ed. 689, decided at December term, 1866. In that case it was held that, even in the absence of a command to that effect in the statute, it was the duty of the officers of the Land Department, immediately upon a grant being made by Congress, to reserve from settlement and sale the lands within the grant; and that, if there was a dispute as to its extent, it was the duty to reserve all lands which, upon either construction, might become necessary to make good the purposes of the grant. This ruling as to the power and duty of the officers of the Land Department has since been followed in many cases. Bullard v. Des Moines & Ft. D. R. Co. supra, and cases cited in the opinion.'

In the case now before us Congress in the statutes referred to had expressly subjected these lands to the operation of the placer mining law, and had authorized their exploration for oil, and their location, entry, and purchase as mineral lands. Congress had in this way exercised its power and manifested its will, and such was the situation when the withdrawal in question was made. Deriving the aim of the

109

« up Executive from the various documents to which we have referred, it may be fairly deduced that the prevailing purpose (and that was the sole purpose so far as the lands here involved were concerned) in making the withdrawal was to anticipate that Congress, having the subject-matter brought to its attention, might and would provide a better and more economical system for the disposition of such public lands, and, secondarily, to preserve some of the oil lands in California as a basis of naval supply in the future, the latter purpose not at that time declared or recognized by Congress. For these purposes the President had no express authority from Congress; in fact, such is not claimed. The authority which may arise by implication, we think, must be limited to those purposes which Congress has itself recognized by either direct legislation or long-continued acquiescence as public purposes for which such withdrawals could be made by the Executive. That the President might, by virtue of his executive authority, take action to preserve public property, or, in aid of the execution of the laws, reserve tracts of land for definitely fixed public purposes, declared by Congress, such as military or Indian reservations, may be conceded; but we are unable to find sanction for the action here taken in withdrawing a large part of the public domain from the operation of the public land laws in the power inherent in this office, as created and defined by the Constitution, or in any way conferred upon him by the legislation of Congress, or in that long acquiescence in the exercise of authority sanctioned by Congress in such manner as to be the equivalent of a grant to the President.

The constitutional authority of the President of the United States (art. 2, §§ 1, 3) includes the executive power of the nation and the duty to see that the laws are faithfully executed. 'The President 'shall take care that the laws be faithfully executed.' Under this clause his duty is not limited to the enforcement of acts of Congress according to their express terms. It includes 'the rights and obligations growing out of the Constitution itself, our international relations, and all the protection implied by the nature of the government under the Constitution." Cooley, Const. Law, p. 121; Re Neagle, 135 U. S. 1, 34 L. ed. 55, 10 Sup. Ct. Rep. 658. The Constitution does not confer upon him any power to enact laws or to suspend or repeal such as the Congress enacts. Kendall v. United States, 12 Pet. 524, 613, 9 L. ed. 1181, 1216. The President's powers are defined by the Constitution of the United States, and the government does not contend that he has any general authority in the disposition of the public land which the Constitution has committed to Congress, and freely concedes the general proposition as to the lack of authority in the President to deal with the laws otherwise than to see that they are faithfully executed.

As we have said, while this court has sustained certain withdrawals made by the Executive, in carrying out a policy for which the use of the public lands had been indicated by congressional legislation, and has sustained the right of withdrawal where conflicting grants had been made by Congress, and additional legislation was needed to expressly declare the purpose of Congress, the court has refused to sustain withdrawals made by the Executive branch of the government when in contravention of the policy for the disposition of the lands declared in acts of Congress. In Southern P. R. Co. v. Bell, 183 U. S. 675, 46 L. ed. 383, 22 Sup. Ct. Rep. 232, it was held that the Secretary of the Interior had no authority to withdraw lands within the indemnity limits of a grant from sale or pre-emption, when Congress had indicated its purpose that such lands might be taken up by settlers before the road had exercised its right of selection. In Brandon v. Ard, 211 U. S. 11, 53 L. ed. 68, 29 Sup. Ct. Rep. 1, the conflict was between an attempted withdrawal in aid of a land grant and a homestead settlement three years later, and this court held that the withdrawal of the lands from sale or settlement prior to the definite location of the road, and

113

before they were selected to supply deficiencies in place or granted limits, was « up without authority of law, and that the homestead settlement, under existing laws of Congress, must prevail over such attempted withdrawal. The same principle was declared and enforced in Osborn v. Froyseth, 216 U. S. 571, 54 L. ed. 619, 30 Sup. Ct. Rep. 420.

In Lockhart v. Johnson, 181 U. S. 516, 520, 45 L. ed. 979, 982, 21 Sup. Ct. Rep. 665, Mr. Justice Peckham, speaking for the court, tersely stated the rule:

112 'Public lands belonging to the United States, for whose sale or other disposition Congress has made provision by its general laws, are to be regarded as legally open for entry and sale under such laws unless some particular lands have been withdrawn from sale by congressional authority or by an Executive withdrawal under such authority, either expressed or implied.'

We think the rule thus stated is the result of the previous decisions of this court, when properly construed, and is consistent with the authority over the public lands given to Congress under the Constitution, and properly rests Executive power to deal with such lands by way of withdrawal upon the express or implied authority of the Congress. In other words, it may be fairly said that a given withdrawal must have been expressly authorized by Congress, or there must be that clear implication of congressional authority which is equivalent to express authority; and when such authority is wanting there can be no Executive withdrawal of lands from the operation of an act of Congress which would otherwise control.

The message of the President of January 14, 1910, indicates that he doubted his authority to make such withdrawals. In that message, after referring to the lax manner in which the government had been disposing of the public lands under the mining and other acts, and the need of properly classifying lands and revising the mode of disposing of the oil and other deposits in them with greater regard to the public interests, but without hindering development, he said:

The power of the Secretary of the Interior to withdraw from the operation of existing statutes tracts of land the disposition of which under such statutes would be detrimental to the public interest is not clear or satisfactory. This power has been exercised in the interest of the public with the hope that Congress might affirm the action of the Executive by laws adapted to the new conditions. Unfortunately, Congress has not thus far fully acted on the recommendations of the Executive, and the question as to what the Executive is to do is, under the circumstances, full of difficulty. It seems to me that it is the duty of Congress now by statute to validate the withdrawals that have been made by the Secretary of the Interior and the President, and to authorize the Secretary of the Interior temporarily to withdraw lands pending submission to Congress of recommendations as to legislation to meet conditions or emergencies as they arise. . . .

116 'I earnestly recommend that all the suggestions which he [the Secretary of the Interior] has made with respect to these lands shall be embodied in statutes, and, especially, that the withdrawals already made shall be validated so far as necessary, and that the authority of the Secretary of the Interior to withdraw lands for the purpose of submitting recommendations as to future dispositions of them where new legislation is needed shall be made complete and unquestioned.'

After the receipt of this message, a considerable number of bills being before the Senate and House of Representatives upon the subject, the matter was taken up and in the House of Representatives a bill was passed providing for withdrawals under

119 certain conditions, and providing that 'all withdrawals heretofore made and now

« up

existing are hereby ratified and confirmed as if originally made under this act.' The bill in that form did not pass the Senate. It was, however, adopted in a materially modified form in the act of June 25, 1910 (36 Stat. at L. 847, chap. 421, Comp. Stat. 1913, § 4523), which reads:

'Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the President may, at any time, in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States, including the district of Alaska, and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an act of Congress.

'Sec. 2. That all lands withdrawn under the provisions of this act shall at all times be open to exploration, discovery, occupation, and purchase, under the mining laws of the United States, so far as the same apply to minerals other than coal, oil, gas, and phosphates: Provided, That the rights of any person who, at the date of any order of withdrawal heretofore or hereafter made, is a bona fide occupant or claimant of oil or gas bearing lands, and who, at such date, is in diligent prosecution of work leading to discovery of oil or gas, shall not be affected or impaired by such order, so long as such occupant or claimant shall continue in diligent prosecution of said work: And provided further, That this act shall not be construed as a recognition, abridgment, or enlargement of any asserted rights or claims initiated upon any oil or gas bearing lands after any withdrawal of such lands made prior to the passage of this act: And provided further, That there shall be excepted from the force and effect of any withdrawal made under the provisions of this act all lands which are, on the date of such withdrawal, embraced in any lawful homestead or desert-land entry theretofore made, or upon which any valid settlement has been made and is at said date being maintained and perfected pursuant to law; but the terms of this proviso shall not continue to apply to any particular tract of land unless the entryman or settler shall continue to comply with the law under which the entry or settlement was made. And provided further, That hereafter no forest reserve shall be created, nor shall any additions be made to one heretofore created within the limits of the states of Oregon, Washington, Idaho, Montana, Colorado, or Wyoming, except by act of Congress.

120 'Sec. 3. That the Secretary of the Interior shall report all such withdrawals to Congress at the beginning of its next regular session after the date of the withdrawals.'

121 The reports of the Senate Committee show that its members were divided as to the authority of the President to make the withdrawal order in question. The majority report stated that, in any view, the President had the authority without additional legislation; the minority reached the opposite conclusion.

122 It is to be noted that the act of June 25, 1910, conferred specific authority for the future upon the President, but gave no approval to the withdrawal of September 27, 1909, containing instead an express provision that the act should not be construed as a recognition, abridgment, or enlargement of any asserted rights or claims initiated upon any oil or gas bearing lands after the withdrawal of such lands, made prior to the passage of the act. While the order of September 27, 1909, withdrew the lands from all form of settlement, location, sale, entry, or disposal under the mineral or nonmineral public land laws, the act of June 25, 1910, excepts from the power of withdrawal conferred upon the President lands embraced in any lawful homestead

125

« up

or desertland entry theretofore made or upon which any valid settlement had been made and was being maintained and perfected pursuant to law. Furthermore, the act provides that the rights of a bona fide occupant or claimant of oil or gas bearing lands, complying with the provisions of the statute relating thereto, shall not be affected or impaired by a subsequent order of withdrawal. In this statute there certainly is no congressional assent to the Executive withdrawal of September 27, 1909. The validation or ratification asked in the President's message was withheld, and only restricted authority for the future was granted in the act of June 25, 1910; not only so, but the rights of the locators involved in this case were preserved to whatever extent they existed in the absence of a ratification of the withdrawal. When express ratification is thus asked and refused, in our view no power by implication can be fairly inferred. Barden v. Northern P. R. Co. 154 U. S. 288, 317, 38 L. ed. 992, 998, 14 Sup. Ct. Rep. 1030; Durousseau v. United States, 6 Cranch, 307, 318, 3 L. ed. 232, 235; Eyster v. Centennial Bd. of Finance, 94 U. S. 500, 503, 24 L. ed. 188, 189. The act of June 25, 1910, neither ratified the withdrawal of September 27, 1909, nor empowered the President so to do by his order of July 2, 1910.

The government of the United States is one of limited powers. The three coordinate branches of the government are vested with certain authority, definite and limited, in the Constitution. This principle has often been enforced in decisions of this court, and the apt words of Mr. Justice Miller, speaking for the court in Kilbourn v. Thompson, 103 U. S. 168, 190, 26 L. ed. 377, 386, have been more than once quoted with approval: 'It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to government, whether state or national, are divided into the three grand departments, the executive, the legislative, and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall, by the law of its creation, be limited to the exercise of the powers appropriate to its own department, and no other.'

These principles ought not to be departed from in the judicial determinations of this court, and their enforcement is essential to the administration of the government, as created and defined by the Constitution. The grant of authority to the Executive, as to other departments of the government, ought not to be amplified by judicial decisions. The Constitution is the legitimate source of authority of all who exercise power under its sanction, and its provisions are equally binding upon every officer of the government, from the highest to the lowest. It is one of the great functions of this court to keep, so far as judicial decisions can subserve that purpose, each branch of the government within the sphere of its legitimate action, and to prevent encroachments of one branch upon the authority of another.

In our opinion, the action of the Executive Department in this case, originating in the expressed view of a subordinate official of the Interior Department as to the desirability of a different system of public land disposal than that contained in the lawful enactments of Congress,* did not justify the President in withdrawing this large body of land from the operation of the law, and virtually suspending, as he necessarily did, the operation of that law, at least until a different view expressed by him could be considered by the Congress. This conclusion is reinforced in this particular instance by the refusal of Congress to ratify the action of the President, and the enactment of a new statute authorizing the disposition of the public lands by

126

« up

a method essentially different from that proposed by the Executive.

For the reasons expressed, we are constrained to dissent from the opinion and judgment in this case.

---

1

Departmental ruling as to the existence of the power.

Report, Commissioner of the Land Office, February 28, 1902, p. 3. 17 Senate Doc. 57th Cong.

Appendix to Call's 'Military Reservations,' 495.

Decisions of Department of the Interior relating to public lands.

1 Land Dec. 702, 31, 552; 13 Land Dec. 426, 607, 628; 1 Land Dec. 553; 29 Land Dec. 33; 31 Land Dec. 195; 34 Land Dec. 145; 6 Land Dec. 317.

Indian reservations:

'Executive Orders Relating to Indian Reservations' (1912).

Public domain, 243.

Report of Commissioner of Indian Affairs, 70-87 (1913).

Military reservations:

Public domain, 247.

14 House Doc. 217 (1898-99).

18 House Doc. 387 (1905-6).

Call's 'Military Reservations' (1910).

Bird reservations:

42 House Doc. 93 (1908).

43 House Doc. 44 (1909).

---

2

The government asserts that reservations by the Executive for Indian purposes, irrespective of the existence of statutory authority, are found collected in The Public Domain, pp. 727, 1252; 1 Kappler, Laws & Treaties, p. 801; and for military purposes in The Public Domain, pp. 748, 1258; 2 Laws of the United States of a Local and Temporary Character, p. 1171. (Whether or not these orders were preceded by Congressional authority does not definitely appear.) It also recites several Executive withdrawals of land for uses related to military purposes, such as lands supplying fuel, water, etc., to military posts, and also a withdrawal to conserve a supply of building stone for harbor improvements. Another instance cited: Where Congress by an appropriation act of June 18, 1878 (20 Stat. at L. 152, chap. 264), had directed the Secretary of War to cause an examination to be made of the sources of the Mississippi river, among others, to determine the practicability and cost of reservoirs for improving its navigation, the Secretary, it is said, made his report and withdrew certain lands in aid of his report, in the hope that they would be 'affected in the event of affirmative congressional action upon said report;' and additional lands were withdrawn subsequently for the same purpose, but after appropriations for the construction of the reservoirs had been made by the act of June 14, 1880 (21 Stat. at L. 180, chap. 211). Attention is also called to withdrawals for a number of purposes, as to correct surveys; to avoid conflicts with private claims; to prevent frauds; to ascertain character of land, etc., shown by a letter from the Acting Secretary of the Interior, dated March 3, 1902, found at p. 7463 of vol. 45, Congressional Record. The reports of the Secretary of the Interior and the Commissioner of the General

« up

Land Office are cited to the effect that supposed oil lands in California were withdrawn from agricultural entry in aid of an investigation of their character and to prevent unlawful application of lieu selections (1900, pp. LI., 75, and 1901, pp. LXIII., 87); that large quantities of coal land were withdrawn to verify the existence of coal deposits because of serious frauds (1907, pp. 13, 251); that temporary reservation was made of the 'Petrified Forest' in Arizona for a proposed national park (Commissioner's Report, 1900, p. 87); and that temporary withdrawals were made for state parks in California and Michigan (Commissioner's Report, 1902, p. 319), all of which were reported to Congress. The land including the Wind Cave in South Dakota was reserved (Commissioner's Report, 1900, p. 91) and later made a national park by the act of January 9, 1903 (32 Stat. at L. 765, chap. 63). The President had created certain reservations for the protection of birds (Rep. Sec. Int. 1909, p. 43), and subsequently an act was passed making it an offense to interfere with birds or their eggs 'on any lands of the United States which have been set apart or reserved as breeding grounds for birds by any law, proclamation, or Executive order' (34 Stat. at L. 536, chap. 3565, Comp. Stat. 1913, § 10252). The

Secretary of the Interior had directed that all applications to purchase certain isolated tracts should be suspended (34 Land Dec. 245), and subsequently an act providing for the desposition of disconnected tracts was approved by Congress (34 Stat. at L. 517, chap. 3554, Comp. Stat. 1913, § 5110). In aid of a bill to authorize Wisconsin to select certain lands, the President withdrew a large area in that state, and the bill was later passed (35 Land Dec. 11; 34 Stat. at L. 517, chap. 3555). Coal lands in Alaska were withdrawn from entry by direction of the President (35 Land Dec. 572), which had been thrown open to entry by Congress (33 Stat. at L. 525, chap. 1772, Comp. Stat. 1913, § 5071), and the propriety of this withdrawal was approved by Congress (35 Stat. at L. 424, chap. 211, Comp. Stat. 1913, § 5075). To support its statement that general recognition of the Executive authority is found in a number of statutes the government cited: The town-site law of March 2, 1867 (14 Stat. at L. 541, chap. 177, Comp. Stat. 1913, § 4791), which contained a proviso that 'the provisions of this act shall not apply to military or other reservations heretofore made by the United States, nor to reservations for lighthouses, customhouses, mints, or such other public purposes as the interests of the United States may require, whether held under reservations through the land office by title derived from the Crown of Spain, or otherwise;' and the act of February 8, 1887 (24 Stat. at L. 388, chap. 119, Comp. Stat. 1913, § 4195), providing for the allotment of lands in severalty to Indians on the various reservations and for other purposes, the opening paragraph of which read: 'That in all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use, either by treaty stipulation or by virtue of an act of Congress or Executive order setting apart the same for their use, the President of the United States be, and he hereby is, authorized . . ..'

The government says, however, that 'there is no publication which can be relied on in determining whether a given Executive order was preceded by statutory authority,' and admits that it is possible that in some of the cases cited there was antecedent statutory authority.

The defendant appends to its brief a list of statutes giving discretionary power to the Executive to make withdrawals, those relating to military or analogous purposes being, 1 Stat. at L. 252, note; 1 Stat. at L. 352, chap. 14; 1 Stat. at L. 555, chap. 38; 2 Stat. at L. 453, chap. 7; 2 Stat. at L. 547, chap. 2; 2 Stat. at L. 750, chap. 99; 4 Stat. at L. 687, chap. 76; 9 Stat. at L. 500, chap. 76; 10 Stat. at L. 27, chap. 77; 10 Stat. at L. 608, chap. 106; those for Indian purposes being, 4 Stat. at L. 411, chap. 148; 10 Stat. at L. 238, chap. 104; 11 Stat. at L. 401, chap. 66; 12 Stat. at L. 819, chap. 119; 13 Stat. at L. 40, chap. 48; for a lighthouse, 1 Stat. at L. 54, chap. 9; with reference to salt springs, 2 Stat. at L. 235, chap. 28; 2 Stat. at L. 280, chap. 35; 2 Stat. at L. 394, chap. 39; and lead mines, 2 Stat. at L. 449, chap. 49; for town sites, 3 Stat. at L. 375, chap. 62; 12 Stat. at L. 754, chap. 80, Comp. Stat. 1913, § 4784; for reservoirs, 25 Stat. at L. 526, chap. 1069, Comp. Stat. 1913, § 4696; and irrigation work, 32 Stat. at L. 388, chap. 1093, Comp. Stat. 1913, § 4700; for lands containing timber for naval purposes, 3 Stat. at L. 347, chap. 22; and for forest reserves, 26 Stat. at L. 1103, chap. 561, Comp. Stat. 1913, § 5121, 30 Stat. at L. 36, chap. 2.

CC∅ | TRANSFORMED BY PUBLIC.RESOURCE.ORG

**GREAT SIOUX RESERVATION**

**DEPARTMENT OF JUSTICE**
**January 4, 1890**
**OPINION OF THE ATTORNEY GENERAL**
**W. H. H. MILLER**
**19 Op A.G. 467 (1890)**

The appropriation made by Section 25 of the Act of March 2, 1889, chapter 405, to be applied and used towards surveying the lands therein described as being opened for settlement, does not become available until acceptance by the different bands of Sioux Indians of the terms of that Act as provided in the twenty-eighth section thereof.

That Act takes effect when, as matter of fact, the consent of the Indians thereto has been obtained. The proclamation issued under the provisions of Section 28 of the Act is only designed to be a public evidence of such consent.

TO THE SECRETARY OF THE INTERIOR:

Sir: There have been submitted to me through Mr. Assistant Attorney-General Shields for opinion two questions, as stated by you:

First. ``Whether the money appropriated by Section 25 of the Act of March 2, 1889 (25 Stat., 893), can be used before the acceptance of the Indians is made known by proclamation by the President of the united States, as provided in Section 28 of said Act.

Second. ``Whether, if upon the report of the commission it appears that the acceptance and consent have been obtained of the Sioux Nation as provided, the Act will take effect thereupon, or only upon proclamation is essential to the Act taking effect aside from the fact being mentioned in the report.''

The twenty-fifth section of that Act reads as follows:

``That there is hereby appropriated the sum of one hundred thousand dollars out of any money in the Treasury not otherwise appropriated, or so much thereof as may be necessary, to be applied and used towards *surveying the lands herein described as being open for settlement;* said

sum to be immediately available; which sum shall not be deducted from the proceeds of lands disposed of under this Act.''

Section 28 reads as follows:

``That this Act shall take effect *only* upon the acceptance thereof and consent thereto by the different bands of the Sioux Nation of Indians, in manner and form prescribed by the twelfth article of the treaty between the United States and said Sioux Indians, concluded April 29, 1868, which said acceptance and consent shall be made known by *proclamation by the President of the United States,* upon satisfactory proof presented to him that the same has been obtained in the manner and form required by said twelfth article of said treaty; which proof shall be presented to him within one year from the passage of this Act; and upon *failure of such proof and proclamation* this Act becomes of no *effect* and *null and void.*''

Section 29 reads as follows:

``That there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of twenty-five thousand dollars, or so much thereof as may be necessary, which sum shall be expended under the direction of the Secretary of the Interior, for procuring the assent of the Sioux Indians to this Act provided in Section 27.''

It will be observed by the reading of Section 28 that the taking effect of the Act generally is made to depend upon the assent of the Indians to the terms of the Act, and that in the event of the failure of the negotiations to that end the Act is to be null and void. This is the plain meaning of the twenty-eighth section, and must be given effect, unless to do so would be to thwart the manifest purpose of the Act.

It is too clear for discussion that Section 29 was designed to be operative, notwithstanding these provisions of Section 28; for it would be absurd to suppose that Congress prepared and passed this long Act, and at the very end appropriated a sum of money for defraying the expenses of the negotiations necessary under the Act, and yet by reason of earlier provisions in the Act made that appropriation invalid. Indeed, upon the well known rule that where there are conflicting provisions in a statute the last shall prevail (Wharton's American law, sec. 628), this twenty-ninth section would be operative, even were the reasons for supporting such construction less conclusive than they are. But the same considerations do not demand that the

appropriation in Section 25 shall be held to be available independently of the result of the negotiations. Indeed, from the reading of the Act it does not appear to me that it was the purpose of Congress that the survey mentioned in Section 25 should be made unless the assent of the Indians to the Act should be obtained. There are many reasons why, so long as these lands should remain in the occupation and control of the Indians as a part of their reservation, such surveys should not be made. The making of such surveys, and the fixing of the necessary monuments as landmarks, would naturally be regarded by the Indians as an evidence of the purpose on the part of the Government at no remote time to take possession of the lands, and would tend to excite bad feelings, if not actual hostility. Under such circumstances there would be no assurance that landmarks so established might not be changed or obliterated; and it is quite certain that the fact that surveys had been made by the Government would be regarded by lawless white men, always to be found in such localities, as an excuse for trespassing upon the Indian lands. Moreover, there was in the nature of the case no necessity for making such surveys before the assent of the Indians to the terms of the Act should be obtained.

It is suggested that Congress knew that upon proclamation of the President these lands would be restored to the public domain and be opened for settlement, and that white settlers would rush in and take possession; and unless the lands herein described as being open for settlement were carefully designated by surveys, little heed would be paid to the proper boundaries of the several reservations contained in the Act, and the result would be numerous conflicts between the whites and Indians, and complications would arise which would be detrimental to the peace and comfort of both Indians and whites. The answer to this suggestion is plain. It does not at all follow that these lands are to be opened for settlement immediately after the proclamation referred to in Section 28 shall be issued.

A settler upon unsurveyed public lands acquires no rights herein (*Burton v. Traver*, 130 U.S.R., 232). Moreover it has been repeatedly decided by the Supreme Court that the President has the power to reserve and withhold any part of the public lands, even after survey, from settlement, and that such reservation by the President prevents any settler from obtaining any right in the premises. *Wolsey v. Chapman*, 101 U.S.R., 759; *Williams v. Baker*, 17 Wall., 144; *Walcott v. Des Moines Co.*, 5 Wall., 681.)

look these up and let me know you can get them your husband Clayton

Such being the law, I am unable to see that the issuing of the proclamation would afford any excuse for settlers entering upon these lands, and, therefore, I see no ground

to apprehend the evil consequences above suggested as likely to result from a proclamation before a survey; and I cannot believe that it was the purpose of Congress to make this appropriation of $100,000 available, and to have the same expended in making surveys, before there was any assurance that the rights of the Indians in the land would be extinguished, and the full title acquired by the Government.

I think it plain that it was the purpose of Congress that this Act should take effect when the negotiations provided for should result in the consent thereto by the different bands of the Sioux Nation of Indians. When such consent should be obtained the contract would be complete. This Act is the proposition tendered to the Sioux Indians by the Government of the United States; their consent is the acceptance of that proposition. When that consent is given the contract is binding upon both parties, and the proclamation is only to be issued as a public evidence of that contract. The proclamation does not consummate the contract; it simply evidences it. The language is: ``That said acceptance and consent (of the Indians) shall be made known by proclamation of the President of the United States, upon satisfactory proof presented to him that the same has been obtained in the manner and form required by said twelfth article of said treaty.''

My opinion, therefore, is that the Act takes effect when, as matter of fact, the consent of the Indians to the Act has been obtained, and that while the proclamation should be promptly issued upon the presentation of said proof, the vitality of the Act is not suspended awaiting such proclamation.

Respectfully yours,
W. H. H. Miller

# *NEWS HAPPENING NOW THAT COULD AFFECT US*

***I thought is was about time to add something to our site. Even though I don't always see some of the articles that are posted in major newspapers, there are some of you members who do, and pass them along to both Clanmother Marilyn and me - Eel Clan Chief Armstrong is one who does - so, nyeahweh Chief Armstrong, and you can all read the articles below:***

**I was made aware of this particular article on one of the lists I belong to....The link to the Indian News site is at the end of the article itself...**

**Interior asks Congress for power to take Indian lands**
**Monday, July 18, 2005**

**indianz.com**

**The Bush administration is once again asking Congress for authority to take "unclaimed" Indian lands and to eliminate its trust responsibility to tens of thousands of individual Indians.**

**In a letter to the Senate Indian Affairs Committee, the Interior Department urged Sen. John McCain (R-Arizona) to add provisions to a bill that is already on the Senate floor. Although the proposed changes were described as "technical," they would give the federal government powers that haven't been the subject of a hearing or prior public debate.**

**Matt Eames, Interior's director of Congressional affairs, said the department needs the ability to take lands that are owned by individual Indians who can't currently be located. Nearly 49,000 Indian beneficiaries, who are owed an estimated $73.9 million, would be affected.**

**"Under state law, a state may sell or auction off certain personal property that has not been claimed by an owner within a certain amount of time, usually within 5 years," the May 10 letter stated. "This is not the case with inactive Individual Indian Money accounts or real property interests."**

**Eames also proposed language to address two court cases -- including one that went all the way to the U.S. Supreme Court -- that favored individual Indians and their constitutionally protected**

**property rights. He said the department needs authority to take highly fractionated lands from beneficiaries, albeit with compensation.**

**"The provision should provide that the escheat of those interests to the tribes involved a taking by the United States and should provide compensation to the heirs of those escheated interests," Eames told McCain.**

**The proposals came in the administration's official response to S.536, the Native American Omnibus Act of 2005. The bill was approved by McCain's committee on May 12 and could be scheduled for a Senate vote any time.**

**If added to the bill, the provisions would eliminate the federal government's responsibilities to tens of thousands of Indian beneficiaries throughout the country who either can't be located or who share ownership in highly fractionated pieces of land. Interior officials have said keeping track of these account holders is costing the department millions of dollars.**

**Over the years, several proposals have been floated in an attempt to close the accounts, an effort that former assistant secretary Neal McCaleb once described as "termination." Not surprisingly, Indian Country hasn't reacted positively.**

**In late 2002, the department proposed an unclaimed property act that was soundly rejected by tribal leaders who were participating in the task force on trust reform. Interior officials blamed the legislation's quick demise on the task force, saying tribal leaders prematurely shared the information with the plaintiffs in the Cobell v. Norton lawsuit and with the media.**

**But the department, tribes, Indian landowners and other stakeholders were able to come together and pass the American Indian Probate Reform Act. The bill, signed into law by President Bush in October 2004, encourages estate planning by individual Indians, establishes a uniform probate code and helps tribes consolidate fractionated lands.**

**Past efforts, however, have not met muster in the courts. In the Babbitt v. Youpee case, the Supreme Court ruled that Congress violated the property rights of about 18,000 individual Indians in the Great Plains and the Midwest by taking their lands without just compensation. The decision was issued in 1997 and the department is still trying to sort out the mess.**

**More recently, a federal judge has found another piece of legislation to be unconstitutional in the DuMarce v. Norton case. It affects members of the Sisseton-Wahpeton Tribe whose fractionated lands were taken without just compensation.**

**The relevant parts of the Interior Department's letter are as follows: The Department also suggests additional amendments be added to S. 536. ... We also recommend two new titles be added to the bill that would provide a technical correction to address the decisions in Youpee v. Babbitt and DuMarce v. Norton and give the Secretary the authority to address unclaimed property.**

**Youpee and Sisseton-Wahpeton A new title should be added to S. 536 that would provide a technical correction to address the decisions in Youpee v. Babbitt and DuMarce v. Norton. The United States Supreme Court in Youpee held the escheat provision of the Indian Land Consolidation Act as unconstitutional. In DuMarce, the District Court for the District of South Dakota found unconstitutional a statute under which any interest of less than two and a half acres would automatically escheat to the Sisseton Wahpeton Sioux Tribe. As a result of these two decisions, the Department is faced with having to revest interests that escheated under both statutes**

**back to the rightful heir. We request that a new title be added declaring that any interest that escheated pursuant to these Acts be vested in the tribe to which they escheated unless they have been revested in the name of the heirs of the allottee by the Secretary since the escheatment. The provision should provide that the escheat of those interests to the tribes involved a taking by the United States and should provide compensation to the heirs of those escheated interests.**

**Unclaimed Property Under state law, a state may sell or auction off certain personal property that has not been claimed by an owner within a certain amount of time, usually within 5 years. This is not the case with inactive Individual Indian Money accounts or real property interests. Often times the whereabouts of account owners are unknown to the Department because account holders do not respond to our requests for address information and our repeated attempts to locate them have been unsuccessful. This may be because the small amount in their account does not make such effort worthwhile. However, the Department must account for every interest regardless of size and we do not have the authority to stop administering accounts where whereabouts of the owner are unknown. We must have the authority to close these small accounts and restore economic value to the assets if the owner does not claim their interest within a certain amount of time. If the owner does not come forward, the revenue generated from the interest should be held in a general holding account against which claims could be made in the future if the owner's whereabouts become known or used to further the fractionation program.**

**Indianz.com**

**March 12, 2005**
**Tribe Lays Claim to 3,100 Square Miles of New York State, but It Will Settle for Less**
**By KIRK SEMPLE**

**The Onondaga Nation, an Indian tribe based in upstate New York, filed a lawsuit yesterday claiming that it owns 3,100 square miles of land stretching from the St. Lawrence Seaway to the Pennsylvania border and including Syracuse.**

**The tribe contends that the State of New York illegally acquired the land in a series of treaties between 1788 and 1822 and has asked the Federal District Court in Syracuse to declare that it still holds title to the land, which is now home to hundreds of thousands of people and includes all or part of 11 counties.**

**It is the largest Indian land claim ever filed in the state. The tribe said that it does not want all of that land, however, but that its principal intent is to gain leverage to clean up polluted sites in the land claim area.**

**The lawsuit names as defendants the State of New York, the City of Syracuse and Onondaga County, as well as five corporations that, the nation contends, have damaged the environment in the claim area.**

**Todd Alhart, a spokesman for Gov. George E. Pataki, said late yesterday that the governor's office had not yet received a copy of the claim. "We will take whatever steps may be necessary to protect the interests of property owners and taxpayers in central New York, the Southern Tier and the northern New York region," Mr. Alhart said.**

**Unlike other Indian tribes that have filed land claims against the state, the Onondaga Nation, which has about 1,500 members, is not seeking monetary damages or the right to operate casinos in**

**New York. Instead, tribal representatives said, the Onondagas want a declaratory judgment saying the land, which they consider ancestral territory, was taken illegally.**

**They then hope to use such a ruling to force the cleanup of sites in the claim area, particularly Onondaga Lake, a federal Superfund site and one of the most contaminated bodies of water in the nation.**

**The Onondaga Nation has made the cleanup of the lake, which is 4.5 miles long and one mile wide, one of its priorities. The tribe has lived near the lake for centuries and regards it as sacred land.**

**Tribal representatives said yesterday that the nation would not sue individual property owners or try to evict them.**

**"The nation has said flat-out that individuals have nothing to worry about," said Dan Klotz, a spokesman for the nation. The Onondagas, he said, "will not waver from that."**

**Other pending Indian land claims in New York have not interfered with property transactions, experts on Indian law said.**

**"They don't plan to press for eviction as a remedy and I don't think there's ever been a court that has seriously considered eviction," said John Dossett, general counsel for the National Congress of American Indians, a Washington, D.C.-based advocacy group for tribal governments. "I think that homeowners can rest easy."**

**At the same time, however, tribal authorities said they were in the market for more land. The nation's reservation is an 11-square-mile parcel south of Syracuse. Joseph J. Heath, an attorney who represents the Onondaga Nation, said if the court rules in the tribe's favor, he expected that settlement talks with the state to follow, including discussions about expanding the nation's reservation and protecting ancestral burial grounds threatened by development.**

**Mr. Heath said the tribe would try to buy land only from "willing sellers" and the government.**

**Still, Mr. Heath and other tribal representatives emphasized that the tribe's main intent was to gain more influence over state environmental policy and push for environmental cleanups in their region. "They're sick of being ignored on environmental issues," Mr. Heath said.**

**The tribe's elders have discussed filing suit for more than 50 years, they said in interviews yesterday. But as the pollution in the lake increased - and their own population expanded - they felt compelled to take legal action.**

**Decades of industrial dumping left a layer of toxic sludge on the lake bottom and drove the federal government to place it on the Superfund list of toxic waste sites in 1994. Last November, state regulators announced a plan to require Honeywell International to conduct a $448 million cleanup of the lake, including extensive dredging of the lake bottom to remove much of the 165,000 pounds of mercury and other toxins that have collected there.**

**Honeywell is one of five companies named in the Onondaga lawsuit. It is responsible for the cleanup because in 1999 it merged with Allied Chemical, which owned a plant that was accused of being one of the lake's main polluters.**

**The Onondagas have called the cleanup plan inadequate and say the state was legally obligated to**

**consult with the tribe's chiefs but did not.**

**Mr. Alhart, the governor's spokesman, rejected the nation's assertion that the state was being lax on the cleanup of Lake Onondaga or that it had ignored the nation.**

**The lawsuit also names four other companies that operate a gravel mine, limestone quarry and coal-burning power plant in the region. In the lawsuit, the Onondagas also named Clark Concrete Company and a subsidiary, Valley Realty Development, which own a gravel mine in Tully, N.Y.**

**The nation has accused the mine of polluting the Onondaga Creek, which runs into the lake. The nation also named Hanson Aggregates North America, the owners of a limestone quarry in DeWitt, and Trigen Syracuse Energy Corporation, a coal-burning power plant in Geddes.**

**Attempts made late yesterday to reach officials with those companies were unsuccessful.**

**Tribal representatives said yesterday that they were not seeking a casino as part of a settlement of the claim. Casinos are a central component of five Indian land claim settlement agreements that Gov. George Pataki announced in recent months.**

**Michelle York contributed reporting from the Onondaga Indian Reservation for this article.**

**Copyright 2005 The New York Times Company**

**washingtonpost.com**

# A Neglected Obligation

**Monday, August 30, 2004; Page A22**

**HEALTH CARE for many Native Americans in this country sinks to Third World levels. According to a draft report by the U.S. Commission on Civil Rights, deaths from alcoholism are 770 percent more likely among Native Americans than the general population; from tuberculosis, 650 percent; and from diabetes, 420 percent. In some tribes, one in two people suffer from diabetes. The Indian Health Service, primary health care provider for more than 1.6 million members of federally recognized tribes, is so underfunded that it spends only $1,914 per patient per year, about half of what the government spends on prisoners ($3,803) and far below what is spent on the average American ($5,065). Funding is so low that to be transferred out of an IHS facility for specialized treatment a patient must be in danger of losing a life or limb.**

**The Bush administration and Congress could help, but they have been sitting for almost four years on a revamped Indian Health Care Improvement Act. The original bill, enacted in 1976, is the cornerstone law that directs health care resources to Native Americans; it expired in 2001. Congress has been appropriating money year to year since then, but the strategy for providing health care for Native Americans is in dire need of a wholesale update, which the neglected bill would provide. Developed by tribal leaders themselves for the first time, the legislation would authorize Congress, among other things, to help Indian reservations recruit health professionals and specialists, expand preventive and behavioral health programs -- an important step in helping to combat alcoholism -- and give tribes more say in decision making. But only after long delay did Tommy Thompson, secretary of health and human services, finally agree last month to make this**

**act a priority and work with congressional staffers to iron out remaining issues. Mr. Thompson and Congress should be kept to their promise of passing this legislation before the end of this session.**

**As important as authorizing the act is making sure there's money to pay for these programs, and Congress has done an abysmal job at that. The administration says it would support an increase in funds to match medical inflation, but that would only lock in the present inadequacies; Sen. Thomas A. Daschle (D-S.D.) has proposed a more substantial and appropriate increase. The federal government is bound by treaty to provide for Indian health, and it is failing. This is an obligation the nation has shirked for too long.**

**© 2004 The Washington Post Company**

**Return To Main Page**

**This page added to site August 30, 2004 and updated July 19, 2005**